No. 2180

Second Circuit Appeal

WILLIAM P. TURNER v. STANDARD OIL COMPANY OF LOUISIANA

(Feb. 20, 1925, Opinion and Decree.)
(March 30, 1925, Rehearing Refused.)
(June 30, 1925, Motion to set aside judgment denied.)
(May 12, 1925, Writ of Certiorari to Supreme Court Refused)

(*Syllabus by the Editor.*)

1. **Louisiana Digest—Master and Servant— Par. 159, 159 (a).**

Where in a case under the Employer's Liability Act, No. 20, 1914, it is shown that an injured employee is able to work although his wrist is disabled he can recover as for partial disability under Section 8, Sub-section 1 (c), Act No. 20, 1914, sixty-five per cent of the difference between what he was earning when injured and what he earns during the period of his disability not exceeding three hundred weeks.

2. **Louisiana Digest—Master and Servant— Par. 159, 159 (a), 160 (j).**

Where the evidence is conflicting as to whether the injured employee suing under Employer's Liability Act No. 20, 1914, is totally or only partially disabled the fact that he is able to earn money working at a sawmill will be sufficient for the court to consider him partially disabled and amend the judgment of the trial court which held him to be totally disabled.

(Employer's Liability Act No. 20, 1914, Section 8 Sub-section 1 (b) and 1 (c) as amended by Act 216, 1924. Editor's note.)

3. **Louisiana Digest—Master and Servant— Par. 160 (e).**

It is not necessary to grant a rehearing in order to make a correction of error granting sixty-five per cent of the difference in injured employee's earning capacity under the Act 216 of 1924, when it should have been sixty per cent under the Act 34 of 1922. Both acts amend Sec. 8, Sub-section, 1 (c) of Act No. 20 of 1914, the Workman's Compensation Act.

**4. Louisiana Digest—Master and Servant—Par. 160 (k).**

In cases under the Workman's Compensation Act No. 20 of 1914, where the attorney's fees in the contract between the attorney and his plaintiff client are approved they may be fixed the same by the court in its judgment. (See Section 22 of Act No. 20 of 1914.)

**5. Louisiana Digest—Master and Servant—Par. 160 (i); Minors—Par. 177, 179, 189.**

Where tutor sues for his minor who becomes of age or emancipated during the suit, the moment the tutor's capacity to represent him ceased, the former minor's capacity to represent himself and prosecute the suit to a final conclusion began without any further citation or changes in pleadings being necessary.

(Code of Practice, Art. 109. Editors' note.)

Appeal from the First Judicial District Court of Louisiana, Parish of Caddo, Hon. T. F. Bell, Judge.

This is a suit by a father for his minor son who is suing under the Workmen's Compensation Act or Employer's Liability Act No. 20, 1914, to recover compensation during disability caused by injures which he received while employed by and working for the defendant. There was judgment for plaintiff and defendant appealed. Judgment amended and affirmed.

Julius T. Long, of Shreveport, attorney for plaintiff, appellee.

T. M. Milling, of Shreveport, attorney for defendant, appellant.

ODOM, J. The plaintiff, William P. Turner, brought this suit under the Workmen's Compensation Act to recover compensation alleged to be due his minor son, Sambo Turner, on account of an injury which he sustained to his wrist on February 17, 1922, while employed by and working for the defendant company.

At the time of the injury Sambo Turner was about 15 years and 6 months old and was receiving a daily wage of $4.50.

In his original petition plaintiff alleged htat while assisting in laying a pipe line a heavy piece of timber fell on his son's left arm and left wrist "thereby breaking, fracturing and permanently and seriously injuring his said wrist and arm to such an extent that he will never hereafter be able to do work of a reasonable character."

And he further alleges that on or about the 17th of May following the defendant company induced his son to resume work for it and that while so working he was again injured, this time by being hit by pipe line tongs, the same arm and wrist being injured, and that on account of said injuries his arm became useless and that he is now unable to do any work of a reasonable character.

And he asks for compensation for four hundred weeks at $16.20 per week.

Plaintiff also alleges that the suit is filed subject to a contract with the attorney, which contract is attached to and filed with the petition. That contract, we note, provides that the attorney shall receive one-third of the net sum which may be recovered.

The suit was filed on June 1, 1922.

On June 7, 1922, defendant answered admitting that Sambo Turner was employed by it and was receiving $4.50 per day on February 17, 1922, and that he was injured on that day by the accidental spraining of his wrist, and alleging that it paid him compensation for eleven weeks, amounting to $198.00, and, in addition thereto, paid for medical examination and medical treatment, and that on May Sambo returned to its office, signed a full receipt, acknowledged that he had fully recovered from all injuries received by him on February 17 and again solicited employment; and that he was re-employed and went back to work on May 10 and worked until May 17.

It especially denies that he received any injury on May 10, but says that he quit work voluntarily.

And it prays that plaintiff's demand be rejected.

The case went to trial on June 23 and was finished on June 27 and continued for argument.

On July 10 the case was reopened for all purposes.

On November 2, the case was again tried and closed, except for the reception of the report of experts, Dr. Barrow and Dr. Spencer.

On November 22 the judge again reopened the case ex proprio motu for the purpose of taking of the physician's testimony.

On January 3, 1923, the case was again reopened and tried on January 30, and on March 10 the court granted judgment for plaintiff for the amount sued for.

Defendant filed a motion for a new trial on March 14 and on April 11 a new trial was granted.

The case was again tried on May 8 and on June 2 the court rendered judgment rejecting plaintiff's demands. This was followed by a motion for new trial on June 6 with a supplemental motion on June 9 and on June 11 a new trial was granted.

On June 28 plaintiff filed an amended and supplemental petition in which he set up, in substance, that the injuries which his son received had caused his "brain, mind and nerves" to be seriously and permanently impaired and injured, each and all to such an extent that his son would never be able to do any work of a reasonable character and that he did not have sufficient knowledge of these impairments to enable him to amend his original petition until June 27, 1923; and that by reason of the injuries and impairment set forth in the original petition and in this amended petition he should recover compensation as originally prayed for.

Defendant filed an exception of vagueness and a plea of prescription of one year to the claim set up in the amended petition. This plea of prescription was referred to the merits July 9.

There was a motion to disallow the amended petition, which was overruled on June 30.

The exception of vagueness was sustained on July 18 and plaintiff was ordered to amend. The amendment was filed on July 25 and on July 31 the court held that the amendment was not in compliance with its order and the defendant was relieved from further answering until the court's order was complied with.

A third supplemental petition was filed on November 3, which was not in compliance with the court's order, and on November 7 the plaintiff was again ordered to amend within twenty days and to comply with the court's order under pain of dismissal.

On November 24 the fourth amended which his son had received "his mind, brain and entire nervous system became seriously permanently impaired" to such an extent that he had to be interdicted and sent to a hospital for insane, and that his mind and nerves are yet affected and that the injury now suffered on his brain, mind and nerves is both physical and functional, and that said injuries to the brain, nerves and mind were caused by the original accidental injury to his shoulder, wrist and arm and that his son was rendered insane and his mind so affected that he cannot now concentrate his mind on study or work, and has spells and imagines strange things; and that his nerves are so affected that his injured

arm may be pricked with sharp instruments without any considerable pain.

These amendments were allowed by the court over the strenuous objection of the defendant, and on December 21 the case again went to trial and was completed on January 11, and on April 11 there was judgment on the merits in favor of the plaintiff for compensation at $16.20 per week for four hundred weeks, or as long as the disability continues, and fixing the fees of the attorneys for plaintiff at one-third of the net amount recovered.

From this judgment the defendant has appealed.

## OPINION

The above very lengthy statement of the proceedings and pleadings is made for the purpose of showing, first, what the issues before the court are, and, secondly, to show the earnestness and activity of counsel on both sides and the very patent desire of the learned and conscientious District Judge to do absolute justice.

As we see it, only issues of fact are presented for our consideration. It is admitted that Sambo Turner was accidentally injured while at work for defendant company on February 17, 1922, and it is contended by plaintiff but denied by defendant he was again injured on May 17, 1922. But whether he did or did not receive additional injuries in May we think is not important.

Sambo Turner says of his injuries and the manner in which he received them:

"I was totin' rider boards and crossin' the creek and there was a log laying in the creek an' I stepped up on it and it turned an' rolled an' threw these boards across my arm."

He says these boards would weigh about 75 pounds, and that his arm was bruised

and made so that he could not use it. He went to Dr. Martin, at Minden, who examined the wound and made report to the defendant company on one of its printed forms as follows:

"This man was carrying a growler board and placed a piece of wood in a pool of water to stand on. He slipped off the wood and the growler board fell on his left wrist."

Dr. G. H. Cassity said that he examined the patient on May 23, 1922, three months after the accident, and says "the examination showed a stiff and painful wrist with creaky sounds in the joints, which is due to inflammation of the joint surfaces. His grip is very weak and he has very little use of his fingers in picking up things. Also he can't open his hand very well. He can't either open or close it well. The X-ray picture shows a dislocation."

In his original petition plaintiff set up these injuries and alleged that they were permanent and such as to render his son wholly incapable of doing any work of a reasonable character; but after the trial on these issues plaintiff amended his petition so as to set out that the results of these injuries have been such as to petition was filed, which seems to have been allowed.

In his fourth amended petition plaintiff set out that by reason of the injuries permanently impair the nerves, mind and brain of his son, Sambo Turner. He, therefore now relies not solely upon the plea that the injury to the arm caused permanent total disability, but relies upon the plea that in some way these injuries to the arm have caused permanent impairment of his mental faculties so that he cannot, on account of his inability to concentrate his mind on any kind of work do work of any reasonable character.

Defendant's position has been and now is that whereas Sambo Turner was injured on February 17, 1922, he fully recovered and went back to work, and that if he now has any affliction, which is denied, it does not arise from and has no connection with the wound which he received while in its employ, and that it is in no way responsible therefor.

In support of its plea that Turner entirely recovered from the effects of the wound which he received on February 17, 1922, defendant cites the fact that on or about March 20 he went to its office and asked to be put back to work, stating at the time that he had entirely recovered; and that he called again, later, with the same request, at which time he was paid the amount of compensation due him; and we find in the record a receipt signed by Sambo Turner on a printed form which recites, among other things, that the payment is in full settlement of compensation under the Workmen's Compensation Act "for all injuries received by me on or about the 15th day of February, 1922", and "I hereby acknowledge that I am fully recovered from the injuries received by me on February 15, 1922." This document is dated May 3, 1922.

Turner then went to work for defendant near Hosston, Louisiana, and worked some six or seven days. On May 17, after completing a day's work, he went to a baseball park and took part in a game of ball. Later on it seems that he entered the Minden High School, joined a football team and there is testimony to the effect that he was seen wrestling with other boys at school.

In the early spring of 1923 he was bitten by a dog which later died. It was thought that this dog had hydrophobia and Turner had an attack of hysteria. He was then interdicted and sent to the Hospital for the Insane at Pineville, Louisiana. While at Pineville he did considerable manual labor, such as cutting wood, moving furniture, scrubbing floors, cleaning lawns, and on one occasion used a heavy sledge hammer.

T. M. Walker, steward at Pineville, says he saw him rolling a wheelbarrow of apples; Mr. Lamurry, supervisor of the asylum, said that Turner did hard work while there, such as cleaning the floor, looking after the laundry, and said he cut wood and such work as that, and in fact that he had done about everything except hoe and plow, and that he had no difficulty in doing whatever he had to do.

Dr. J. N. Thomas, superintendent of the asylum at Pineville, testified that Turner was examined by himself, Dr. Spence and others while he was there; says he tested his grip and it was normal; saw that his left arm was sensitive to the prick of a pin; both hands and both arms were normal; saw him working cutting wood for a period of five minutes, and says he used both hands, and that he was in first-class condition when he was finally discharged.

To the same effect is the testimony of Dr. Spence, connected at that time with that institution, and some other employees of the asylum.

Mr. J. T. Mullens, who was employed by the defendant company, says Turner worked under him fixing fences and "he was a pretty good hand to work for me," and says that to the best of his recollection he used the hammer in his right hand.

In this connection it is well to state that Turner is naturally left-handed and that up to the time of this accident he

would use his left hand instead of his right hand.

R. A. Fitch of the Standard Oil Company says he saw Turner throwing a ball about May 17 and that he threw it with his right hand.

A man by the name of Ogden, employed by the defendant to watch Turner, says he saw him wrestling on the school ground at Minden, using both hands; saw him on the fair grounds using his left hand to hold an ice cream cone; saw him scratch himself with the fingers of the left hand.

Mr. J. B. Lee says he saw Turner scratch with his left hand and also use the same hand to hold an ice cream cone.

Ogden says he has no one to corroborate his testimony as to the wrestling.

Defendant relies also upon the testimony of eminent specialists to the effect that there is no physical paralysis of the nerves or muscles of Turner's left hand or arm.

Hence, having shown that he has used his left hand and arm, and that there exists no physical paralysis thereof, defendant rests its case.

We have made a very careful examination of the testimony of all the witnesses in the case and have reached the conclusion that the testimony does not sustain the contention of the defendant that Sambo Turner has recovered entirely from the wound which he received on February 17, 1922. Nor does it sustain the plaintiff's contention that he is totally disabled.

Referring to this testimony somewhat in detail, we find that Turner did sign a receipt for the sum of $198.00, compensation paid him by defendant, which receipt recited that this was the full amount due him on account of the injury which he had received and that he had fully recovered.

We have no doubt that he thought at the time that he had recovered at least sufficiently to go back to work; nor have we any doubt that he was mistaken. It would appear that he was anxious to go back to work. He called at the office of defendant three times asking that he be put back to work, and when assigned a task he made an effort to perform it. His conduct does not indicate that he had any desire to prolong the period of disability, notwithstanding he was drawing compensation. He was finally given work, not the kind he had been doing but lighter work, presumably at the same wage. But he worked only a few days when he failed to report one morning, and the foreman, Mr. Beckam, found him in bed.

Mr. Beckam says that Turner told him his arm was swollen and that he was going to town to get some dressing or liniment for it.

Now it seems strange that after having been so anxious for work and after having been assigned to a less heavy task, he would quit it if indeed he experienced no difficulty in performing it.

He again reported to the office and was sent to Dr. Smith, who, in turn, sent him to Dr. S. C. Barrow, radiologist, who, on May 3, made an X-ray picture of the left arm and wrist, and when asked to interpret the picture, he said, "and the plate shows a slight outward and backward displacement of the lower end of the ulna." He made another picture on June 3 which showed the same condition. He said no fracture was indicated.

Dr. Smith, who at that time was the company physician, was shown the picture and said that it showed no fracture. He further said that he examined Turner about May 22 or 23 and found no evidence of any injury. He probably meant that he could find no evidence of any additional injury, which Turner claimed to have received after he returned to work.

On November 2, 1922, Dr. S. C. Barrow was again called as a witness for defendant. He testified that he had made three X-ray pictures of Turner's wrist and arm, one on May 23, one on June 13 and one on August 2, 1922. He says of the plate made August 2: "Plate shows slight upward and backward displacement of the lower end of the ulna."

Dr. Smith, on the same date, said the picture showed slight displacement of the bone, but says he can't see that it would have any appreciable effect, and further, "as far as use is concerned, impaired very little."

Referring to the testimony that Turner played football, baseball and wrestled at Minden High School, we have carefully read the testimony of the witnesses on that point and are by no means satisfied that he took any part in these games which involved the use of his left hand.

Mr. Ogden, the detective employed by the defendant company, says that he saw Turner romping and wrestling on the school grounds. When asked to explain just how he wrestled, he said: "He would put his left hand around a boy's neck and catch the wrist with his right hand and choke him down." He does not say that he saw him use his left hand or fingers. It may well be that he caught his left arm above the wrist with his right hand.

Prof. Spencer of the Minden High School faculty states that Turner wanted to join the football team but did not get on the "squad." Says he went through the motions but did not do much. Says when he gave orders Turner "took his place there in one position to do what he could." He says he did not notice him particularly. Does not know that he played in the scrimmage.

His testimony does not indicate that Turner did any playing involving the use of the left hand.

Ardis Dickens, a member of the ball team, says Turner would run signal and practice a little. He did not see him wrestle—did not see him do anything involving the use of his left arm.

Richard Taylor, another of Turner's schoolmates, says he did not see him wrestle or use his left hand. He says Turner was not on the school grounds on the 11th of October, the day that Ogden saw him wrestling there. He says he did not play football, he only ran signals.

There is evidence in the record that he did take part in baseball games; caught the ball in his right hand, and some say that he batted the ball.

As to the work that he did at the hospital for the insane at Pineville, Mr. T. Lamury, supervisor, says that for about eight days after he was admitted he worked all right, but at the beginning he complained that his left hand was sore, but later he did any kind of work there was to do.

J. A. Weaver testified that he was employed at the hospital at the same time that Turner was a patient there and said that Turner had a bad hand and that

he permitted him to carry water, etc. He says that Turner could not do heavy work and that by order of Mr. Lamurry he put him in the straightjacket because he would not do hard work, but that Turner still told him that he could not do heavy work on account of the condition of his arm.

Mr. Moreland, who was a patient at Pineville while Turner was there, but who seems to have been discharged, says that he slept with Turner while there; that his left wrist was enlarged, is stiff, and he cannot use it much; that the arm has red and white spots on it; that while working he does not close his fingers; says the ligaments in his wrist seemed to be adhered; and that this condition existed when Turner got there.

While this man, Moreland, was a patient at the hospital at that time, it seems that he is a man of fair intelligence, fairly well educated and had at one time studied medicine. He says that Turner complained a great deal and could not sleep at night.

Dr. Thomas says he saw Turner working, cutting wood, but says Turner told him that he could not use his arm much at times but that it was getting better and that it hurt him only when he used it for a considerable length of time.

From the fact that Turner was sent to the Hospital for the Insane on account of a mental impairment, we are inclined to the belief that it is probable that Dr. Thomas and his assistants there noticed more carefully Turner's mental than his physical condition. We have the greatest respect for Dr. Thomas and have no reason to doubt the sincerity of any of the people who are connected with that institution; but from a very careful examination of all the testimony given by the physicians and others connected with that institution we get the impression that their observation of Turner's physical activities was more or less casual. For instance: Dr. Thomas is very positive that there was no physical impairment of Turner's left arm, and he says he saw him work, but he says he watched him for only five minutes, and says he saw him use the sledgehammer. We think it is very probable that Dr. Thomas did not observe carefully to see whether Turner gripped the handle of the sledgehammer with his left hand and that it is very probable that, as explained by Turner and as explained by Dr. Cassity after saying that Turner used the sledgehammer, that he merely used his left hand to steady the handle. We think it very probable, also, that Turner was making a very strenuous effort to convince Dr. Thomas and others connected with that institution that there was nothing the matter with him physically in order to induce them to release him. It is in evidence that he was doing all he could to get them to release him so that he could return to his home.

Turning now to the testimony more favorable to plaintiff, we find that a number of lay witnesses have testified that he has not recovered from the injury, among those being his father, his mother, and Mr. E. B. Taylor, who says that he has seen him in great pain.

Sambo Turner says that he cannot use his arm; that he cannot feel the prick of a pin in the arm from the wrist to the elbow; cannot distinguish between hot and cold applied to the arm.

With reference to the testimony of the doctors and experts, we find considerable conflict as is usual in such cases.

On November 2, 1922, the court appointed Dr. S. C. Barrow and Dr. Spencer to make

a "galvanic and fradis test and to report to the court both from the standpoint of muscles and nerves and the outer sensibility of the skin of the hand and fingers."

On the following day Dr. Barrow reported that he and Dr. Spencer had made the examination of Sambo Turner's left arm and that measurements of the arm showed that the two arms were practically the same; that the sensation in each arm is about the same; and that the muscles of the left arm react to the galvanic currents in practically the same manner and degree as those in the right arm, showing absence of paralysis of muscle or nerves, and he closes the report thus: "It is my conviction that the sensation muscle and nerve action of this limb is normal."

That report is dated November 3 and is not sworn to.

On November 4 Dr. Spencer reported to the court under oath, in which he gave it as his opinion "that Mr. Turner is suffering from a true functional disability of the left forearm and hand," and says that from the history given him it is his opinion that this functional disability was brought about by the accident as claimed.

He explains that a functional disability is a condition in which an individual cannot properly use a member "without having an actual lesion of the member," and he further says that it is his opinion that the patient can use his hand "to a certain extent," and again, "the dividing line between functional disability and malingering is often difficult to draw, but in this case I think a true functional disability exists."

Thus it will be seen that one of the experts appointed by the court is of the opinion that the sensation muscle and

nerve action of Turner's limb is normal which means, as we understand it, that the arm is now whole as ever, while the other is of the opinion that a real functional disability exists, and that this functional disability was brought on by the injury as claimed.

Dr. C. H. Cassity testified that his examination of Turner, made May 23, 1922 showed a stiff and painful wrist with creaky sounds in the joints due to the inflammation of the joints surface, and he corroborates Dr. Barrow that there is a backward displacement of the ulna; in other words, it is dislocated, and that it will take two years for it to form another joint and that the wrist will never be as good as before the accident.

He testified on November 2 that since he made the examination of May he had made three more, the last one on November 1, and that there had been no improvement; that he had used an electric machine and found that the boy had very little sensibility in his hand or arm up to the elbow and had very little power of motion.

He testified again on May 8, 1923, and says that he finds the same condition, except that the discoloration of the skin is more pronounced and that he stuck a needle in his arm in the presence of the court while the patient was blindfolded and that he showed no sense of emotion.

Dr. O. C. Rigsby testified that he examined Turner on November 1, 1922, and "I made a careful examination of that and all the tests, such as pricking with a pin and tests for detecting sensibility, and I found that his hand and wrist are paralyzed due to the nerve injury."

Dr. R. C. Tomkins, coroner of Webster parish, testified on January 20, 1923, that he had made an examination of Turner's

arm on the day before and that there is a very marked deformity, a thickness of the joint. He says that he can use it some, of course, but not long at a time, and that there seems to be a paralyzed condition of the arm.

Dr. S. W. Boyce testified on January 30, 1923, that he examined the boy's arm on the day before and that he found his fingers somewhat swollen; his hand had a stiff feeling; that he had no sense of pain up to about half-way between the wrist and elbow and loss of sense of touch in the same area, and that "all motion that took place in the wrist joint is lost." He said he tested him very thoroughly and became convinced that he had lost all sense of pain in the lower arm.

Dr. J. B. Kilgore says he examined the patient on May 15, 1923, and found his left arm discolored and enlarged and, "I would say he has a bad arm and impaired to a considerable extent today." He does not know whether it will get better or not.

Dr. E. S. Spence, who was at that time connected with the Pineville Hospital for the Insane, was a witness and saw pins and needles stuck into Turner's arm and said he did not see the slightest movement of his face. He was asked to explain and said that he could not do so.

Dr. Clarence Pierson examined Turner about March 3, 1923 and says he found him very much disturbed mentally but does not think that condition could have been brought about by the use of drugs. He says that he has less sensation below the elbow and the circulation is slightly impaired and the left arm is considerably cooler than the right.

Dr. Frank H. Walk, a witness for the defendant, testified that he made an examination of the plaintiff on December 23rd and was asked: "What did you find, what condition?" and he said: "Well, there was no anatomical lesion, such as you would fully expect; his fingers could be moved, flexible from an anatomical standpoint, no callous, no evidence of ciricololis, which you get following a Coles fracture; that was not present; the limb was discolored and he could apparently use it; however on positive motion there was no pain to amount to anything to indicate an injury."

If the above means anything, it means that on December 23, 1923, almost two years after the accident, there was, in the opinion of Dr. Walk, who testified for defendant, something wrong with Turner's arm; it was "discolored"; he could "apparently use it" and there was no pain "to amount to anything to indicate an injury". He further says he found "a glove anesthesia," which is an area of the arm where there is no feeling covering the area of a glove. He says it is a functional disease and he attributes it to hysteria.

A reading of the testimony of all the witnesses, doctors, experts and others, will disclose that with the exception of Dr. Thomas and one or two others at Pineville, they are unanimous in the opinion that there was on the dates on which they testified something wrong with Turner's arm; they differ as to the cause, but all agree that he is suffering some disability.

Dr. Barrow made an X-ray examination of his arm shortly after the accident of February 17, 1922, and says that his examination and X-ray disclosed that there is a displacement of the ulna. That is denied by only one or two. The plate is in the record and very plainly shows the dislocation. It is asserted and not denied

that the skin on the arm is discolored; that the left arm is not as warm as the other; that it is enlarged slightly; that the nerves are paralyzed below the elbow, as is evidenced by the fact that he permitted pins and needles to be inserted into his skin and flesh without the slightest indication of feeling or pain.

The experts differ, not as to whether or not there is disability, for they all agree that there is, but as to the cause of it, some claiming that it is what may be called anatomical and the others that it is a functional disease or functional disability.

Dr. Spence gave it as his opinion in the report which he made in response to the court's appointment that Turner is suffering from a true functional disability which was brought about by the accident as claimed. He later testified that he had changed his opinion, and he gave his reasons for doing so. These reasons do not appeal to us as having any force.

We think, as stated, that the testimony abundantly shows that the plaintiff is now or was on the dates of the various trials suffering from disability. A majority of the witnesses are certain that this disability was brought about by the injury which Turner received to his arm and muscle on February 17th. Some of them claim that the paralysis or glove anesthesia which they find that Turner is afflicted with is a condition of mind and not of the body; but as far as we can see it is not seriously disputed by any of the experts that the injury is responsible after all for that condition.

Our conclusion, therefore, is that he has not recovered from the accident of February 17th, 1922.

The very able and learned counsel for defendant apparently do not deny that Turner is now or was on the date of the trials suffering from disabilities, but they say that his disability results from a "voluntary or involuntary control originating in the mind," and they say "this glove anesthesia is most often found in hysterical patients who for some reason believe that they are unable to use one of the members." The anesthesia of Turner's arm did not follow any anatomical destruction of the nerves and the neurologists and physicians testify positively that the same could not have been caused by the destruction or impairment of a nerve or muscle."

We are unable to agree with counsel and the specialists in the view that Turner is suffering from no disability except that which originates in the mind. It may be and probably is true that it is possible for an individual to so control the muscles of his body as not to show sense of pain or sense of touch when the sensory nerves are pricked and otherwise disturbed; but, to say the least, such cases are rare indeed. One of the eminent specialists said that he had never seen a person who could do that unless it was in a show.

But the glove anesthesia is not the only evidence of an injury to Turner's arm. He has a displaced or dislocated ulna, the skin on the lower arm is discolored, it is slightly enlarged, and the temperature in the left arm is slightly lower than in the other one.

Suppose it to be conceded that the glove anesthesia which the specialists say he has results from a mental condition or process, will it also be contended that he could by any sort of mental process or control reduce the temperature in that arm or cause discoloration of the skin? We hardly think that any such suggestion will be made.

It might, we think, be suggested with some degree of plausibility that lack of use might produce either of the latter conditions; but if we adopt defendant's theory we would have to say that Turner not only can but has in fact constantly made use of his left arm, wrist and hand, and there is, therefore, no decay on account of non-usage of the member.

Our opinion, based upon the testimony as a whole, is that Turner can use and has used to a limited extent the left arm, wrist and hand, but that he still is partially disabled as a result of the injury sustained on February 17, 1922.

It is plaintiff's contention that he is totally disabled from doing any work of a reasonable character and that view seems to have been adopted by the court below, as it allowed him sixty per cent of his wages for 400 weeks. We do not concur in that view. The only theory under which we could hold that he is totally disabled is that his mind is so deranged that he cannot concentrate on work of any kind.

That is not the case, as is evidenced by the fact that when the case was tried the last time in the District Court on December 23rd, his father testified that he was then at work at a small sawmill and was earning $1.50 per day.

Insofar as the District Court held that plaintiff is totally disabled, that decision is not correct. Plaintiff's son is only partially disabled. He is entitled to compensation to be fixed at sixty-five per cent of the difference between what he was earning when injured and what he is able to earn now.

We do not find it necessary to remand the case to ascertain what he can earn under present conditions. There is testimony in the record that he was earning $1.50 per day on December 23, and we shall adopt these figures in fixing the compensation. He was earning $4.50 per day when injured. We hold that he is partially disabled as a result of the injury of February 17, 1922, and that he is entitled to compensation as allowed by law in case of partial disability fixed at sixty-five per cent of the difference between what he could earn before the injury, or $4.50 per day, and what he can earn now, or $1.50 per day.

We find that he was paid full compensation up to and including the 3rd day of May, 1922, and the compensation under this judgment should begin on that date.

For the reasons assigned, it is therefore ordered, adjudged and decreed that the judgment appealed from be amended so as to read as follows: It is ordered, adjudged and decreed that William P. Turner do have judgment in his favor for the use and benefit of his minor son, Sambo Turner, against the Standard Oil Company of Louisiana in and for sixty-five per cent of the difference between what Sambo Turner was able to earn before he was injured and what he is now able to earn, or a weekly compensation of $11.70, during the period of disability, not to exceed however, a period of three hundred weeks, payable from week to week, beginning on the 3rd day of May, 1922, each of the weekly payments bearing legal interest from its maturity until paid. Defendant to pay all costs of the suit.

It is further ordered, adjudged and decreed that the fees of Julius T. Long, attorney representing the plaintiff herein, are hereby fixed at one-third of the net amount recovered and collected under this judgment.

———

ON APPLICATION FOR REHEARING

REYNOLDS, J.  Defendant asks for a rehearing herein and that this case be

sent back to the District Court for trial the sixth time. In our opinion this should not be done except in an extreme case.

We based our decision herein on the fact that the evidence introduced, as a whole, convinced us that Elmer Turner on the date of the last trial of this case, March 5, 1924, had not recovered from the injuries received by him February 17, 1922, while he was performing services arising out of and incidental to his employment in the course of his employment by the defendant in his employer's trade, business or occupation.

Defendant's able brief on application for rehearing has not changed our opinion as to this fundamental fact. Hence, we do not see our way clear to longer delay rendering a final decree insofar as this court is concerned.

Defendant has called our attention to the fact that we rendered judgment for 65% of the difference in the earning capacity of plaintiff's son since the accident as compared with his earning capacity before the accident. This was an error. The amount should have been fixed at 60% of the difference in his earning capacity, as fixed by Act 34 of 1922, instead of 65%, as fixed by Act 216 of 1924, and this correction must be made.

But it is not necessary to grant a rehearing in order to make the correction.

Defendant further calls our attention to the fact that our former decree herein does not make it clear that defendant is entitled to credit for $198.00 paid by defendant to plaintiff on the injury received by his son.

Defendant's claim that it is entitled to this credit is correct, and the decree herein will be so recast as to give it the benefit of this credit.

For these reasons it is ordered, adjudged and decreed that William P. Turner do have judgment in his favor and against the Standard Oil Company of Louisiana in and for sixty per cent of the difference between what Elmer Turner, son of the plaintiff, was able to earn before he was injured, and the amount he was able to earn thereafter, or a weekly indemnity of $10.80 during the period of disability, not to exceed a period of 300 weeks, from March 25, 1922; (this amount being based upon the demands in plaintiff's petition); each of the weekly payments bearing 5% per annum interest from its maturity until paid.

This judgment is subject to a credit of $198.00 to be deducted from the first amounts due on said judgment.

It is further ordered, adjudged and decreed that the fees of Julius T. Long, attorney representing the plaintiff herein, are hereby fixed at one-third of the net amount recovered and collected under this judgment.

---

## ON MOTION TO SET ASIDE JUDGMENT.

ODOM, J. William P. Turner brought this suit for the use and benefit of his minor son, "Sambo", or Elmo Turner, under the Workmen's Compensation Act to recover compensation during disability caused by injuries which he received while employed by and working for the defendant company.

The case having been disposed of in the District Court was appealed to this court, the appeal being lodged here on April 21, 1924.

The case was finally disposed of in this court on March 30, 1925.

In May, 1924, while the appeal was pending in this court, "Sambo" or Elmo Turner married. He was then under 18 years of age but became 18 on the 7th day of August following.

That he was fully emancipated on reaching the age of 18 years, after the marriage, is conceded.

He did not make application to be made a party to the suit during the pendency of the appeal nor did the defendant suggest that he had been emancipated and ask that he be made a party. In fact, it appears that neither his counsel nor counsel for defendant knew of his marriage until some time after the happening of that event.

But on May 21, 1925, after the judgment of this court had become final and a writ had been refused by the Supreme Court, the said "Sambo" or Elmo Turner in pro per filed a motion in this court setting up the fact that he married in May, 1924, and that he had reached the age of 18 years in August, following, during the pendency of this appeal in which application he set up:

"That he consents to acquiesce in the judgment recently rendered in this case by the court."

And prays that he be authorized and permitted to become a party plaintiff and to acquiesce and consent to the judgment

On the following day counsel for defendant, having learned of the marriage of "Sambo" or Elmo Turner and of his motion to be made a party to this suit, came into court with an application setting up the facts of the marriage and emancipation of "Sambo" or Elmo Turner during the pendency of the suit and setting out:

"That the right of William P. Turner, as the father of 'Sambo' or Elmo Turner to represent his son in this case ceased and terminated when 'Sambo' or Elmo Turner married and reached the age of 18 years and that all proceedings had in this case subsequent to the filing of the transcript are therefore absolute nullities."

And then follows the prayer:

"Wherefore appellant prays that 'Sambo' or Elmo Turner be made a party hereto and that after he has been made a party hereto that this case be regularly fixed for argument in accordance with the rules of this honorable court."

There being no opposition to "Sambo" or Elmo Turner's application to be made a party to this suit we have signed and entered the order.

But defendant, in effect at least, suggests that all proceedings in this court subsequent to August 17, 1924, the day on which "Sambo" or Elmo Turner was emancipated by marriage, are null and void, and asks that our judgment be disregarded and that the case be regularly fixed for argument.

Code of Practice, Article 109, provides:

"Tutors act themselves, in all judicial proceedings, in the name of their minors, and in all suits which may be brought for them, without making them parties to said suits."

The present suit was brought by William P. Turner for his minor son, "Sambo" or Elmo Turner. He represented his son in the suit. But the son was in court during each of the five different trials of the case and each time gave evidence in his own behalf. It cannot, therefore, be said that he was ignorant of the fact that the suit had been instituted and was prosecuted in his behalf.

The suit was to recover compensation for him on account of injuries which he as an employee of the defendant received.

He married, and upon reaching the age of 18 years became emancipated for all purposes. His father's capacity to represent him further in the suit ceased because he "Sambo" or Elmo Turner, was then vested under the law with full authority to prosecute the suit to a final conclusion. There was nothing further to do except for the attorney who had been engaged by his father to represent him in this court.

The appeal was prosecuted with the full knowledge and acquiescence of "Sambo" or Elmo Turner. He did not ask to be made a party. He did not have to do that.

In the case of Martel, Tutor, vs. Francois Richard et al., 15 La., Ann. 598, the court said:

"If this suit was properly brought for the minors, when connected by the tutor, it is their suit, as much so as if it were commenced in their individual names as majors, and, as a consequence, they may prosecute the same when they attain the age of majority without any new citation or formal changes in the pleadings."

In the case cited a tutor brought a suit to annul a sale of land and recover a certain amount of damages. The defendant, among other pleadings, filed an exception alleging that the minors had arrived at the age of majority and that the tutor was funtus official and could not prosecute the suit.

The District Judge dismissed the suit, being of the opinion that the proof showed that the minors had attained the age of majority. Plaintiff appealed to the Supreme Court which held that the proof did not show that all of the minors had attained the age of majority and it reversed the judgment of the lower court and remanded the case to be tried on its merits.

The court said:

"The tutor represents the minors so complete that when he has once brought a suit for them, or answered an action against them, no further petition or answer can be required on their behalf."

In the case of Mrs. Bertha Lewis vs. J. P. Pepin, Tutrix, 33 La., Ann. 1417, the Supreme Court refused to dismiss an appeal on the ground that it was taken by the tutrix after her wards had attained their majority when the record did not show that the wards were made parties.

The court in this case cited and quoted from the Martel case, supra.

In the case of Pattison vs. Gulf Bag Co., Inc., 116 La. 963, 41 South. 224, the suit was brought by the father to recover damages for an alleged libel and slander of his daughter, who was a minor. The daughter being over the age of 18 years married during the pendency of the suit in the lower court and her husband was made a party. There was judgment in her favor for $500, from which judgment the defendant appealed.

The father, it seems, appeared in the Supreme Court and asked for an amendment of the judgment. The court held that the father had no standing in court and that he had no capacity to represent his daughter, she having been emancipated, but there was no appearance in the Supreme Court by the daughter. She did not ask to be made a party to the suit after she was emancipated by marriage either in the District Court or the Supreme Court. It seems to have been taken for granted that it was not necessary for her to take any formal action or step in the case after she was married. The Supreme Court passed on the case with all the facts before it.

In the case at bar, the moment that "Sambo" or Elmo Turner became 18 years of age after his marriage he was emancipated for all purposes, and at that moment his father's capacity to represent him ceased; but at that same moment "Sambo" or Elmo Turner had the capacity to represent himself in court and prosecute the suit to a final conclusion. He did not have to be formally recognized as plaintiff under the authority of the cases above cited, nor did he have to make any formal appearance in court. Judgment was finally rendered in his favor, with which he now says he is satisfied.

If a judgment had been rendered against him under the circumstances, he would, in our opinion, have been bound for the reason that he was in court personally during the trial; the suit was brought for him; and he was fully cognizant of all the proceedings. When he became emancipated he was thereby vested with full capacity to represent himself in court. He did not see fit to object to the prosecution of the suit but acquiesced in all that was done during a period when he had capacity to bind himself and to be bound.

Could he now, after acquiescing in what has been done, repudiate the judgment? We do not think so.

We find the following to be the law as stated in 34 Corpus Juris, page 993, under the head of "Judgments":

"A person will be concluded by a judgment in a suit if, with his knowledge, the suit is commenced and prosecuted or defended in his name, and judgment rendered therein, without objection on his part, although a contrary rule has been asserted where such person has done nothing which has caused the other parties to act in some way which will prejudice them if the judgment is not held conclusive."

Counsel for defendant cite numerous authorities to the effect that when a litigant dies during the pendency of an appeal his heirs must be made parties. But those cases are not in point. When a litigant dies he ceases to exist and there is therefore no one before the court for whom or against whom a judgment may be rendered. Someone has to be substituted for him.

Counsel also cite the case of Roe vs. Caldwell, 138 La. 652, 70 South. 548, where a tutrix died prior to the signing of the judgment in the lower court, and the court held that the appeal must be dismissed as the minors were not represented.

That holding is based upon the theory that a minor has no capacity to represent himself in court and that upon the death of the tutrix someone must be appointed to represent the minor. But if the minor had become of age on the day before his tutor died the situation would have been altogether different; because at the moment the tutor ceased to represent the minor the minor was relieved of his incapacity and could have represented himself.

In the case at bar, William P. Turner represented his son, "Sambo" or Elmo Turner, until the latter became emancipated. At that moment "Sambo" or Elmo Turner was in court with full capacity to represent himself and to take up the suit where his father left it.

We think the judgment is valid and binding upon all parties.

For the reasons assigned, it is therefore ordered that the defendant's application to have the judgment heretofore rendered by this court declared a nullity and to have this case reset for argument is denied.