**MITCHELL v. T. L. JAMES & CO., Inc., et al.**

**No. 1742.**

Court of Appeal of Louisiana. First Circuit.

Oct. 5, 1937.

Talley & Richardson, of Bogalusa, for appellant.

Ott & Johnson, of Franklinton, for appellee.

OTT, Judge.

The suit is for compensation for 400 weeks at $17.55 per week, a total of $7,020, based on total, permanent disability growing out of an accident and injury sustained by plaintiff on July 29, 1935, while working for the defendant company near Bogalusa on a road project, in which accident plaintiff fractured his wrist in cranking a tractor. By a supplemental petition, plaintiff made the Maryland Casualty Company, the insurance carrier, a party to the suit, and prayed for the same judgment against the insurer as against the employer.

As a first alternative plea, plaintiff asks that, if the court finds that he is not entitled to total permanent disability but is entitled to permanent partial disability, his compensation be fixed at $14.62 per week for 300 weeks, being the difference in his earnings before the injury and what he was earning when the suit was filed, which would make his total compensation for partial disability aggregate the sum of $4,386. And as a second alternative plea, in case it is found that plaintiff is not entitled to either total or partial permanent disability, he asks for compensation on the basis of the loss of his arm, or the loss of the use of his arm, that is, for 200 weeks at $17.55 per week, a total of $3,510.

Defendants admit that plaintiff suffered an injury to his right hand on the date alleged and while in the employ of the James Company, and that plaintiff was paid compensation on account of said injury for a period of one week and five days, but they deny that plaintiff is suffering, or has suffered, any further disability on account of said injury.

The trial court rendered judgment in favor of the defendants rejecting plaintiff's demand. From this judgment of dismissal plaintiff prosecutes a devolutive appeal.

█ . As the defendants admit that plaintiff sustained an injury to his arm on July 29, 1935, while in the employ of the James Company, the question presented for decision is whether or not the plaintiff has suffered, and is now suffering, any further disability on account of the injury than that for which he has been compensated. And as a corollary of this question it follows as a legal proposition that plaintiff bears the burden of proving by a preponderance of the evidence and to a legal certainty not only that he has suffered further disability but that the disability bears a causal connection with the injury. It was on the ground that plaintiff failed in his proof of the last proposition that the trial judge rejected the claim for further compensation. We are asked to reach a different conclusion from the evidence which is both voluminous and conflicting.

The peculiar and rather unusual nature of the complaint for which plaintiff is asking compensation, the conflicts in the testimony, both lay and expert, and the zeal and earnestness with which counsel on both sides have presented the case, combine to make this a difficult case to decide. When we add to this the fact that the mental attitude, the subjective symptoms, and the honesty of plaintiff are involved in a proper decision of the case, it can be readily seen that there can be no positive assurance of a 100 per cent. perfect decision of the case either by the trial court or by this court.

The X-ray made of plaintiff's right arm just after the accident shows a fracture of the bones of the wrist. Plaintiff's arm was put in splints for some 4 or 5 weeks. During the time his arm was in splints he worked off and on for the employer, operating the tractor with his left hand. The preponderance of the evidence shows that plaintiff drove a pulpwood truck for his brother more

or less regularly for about 7 weeks from about the 7th of September until the latter part of October, 1935.

It appears from the medical testimony that a fracture of the wrist such as plaintiff sustained ordinarily will heal in less than 5 weeks. It therefore follows that under ordinary conditions plaintiff's fractured wrist should have been healed when he began driving the wood truck in September as more than 5 weeks had then expired since the accident. Several witnesses testify that plaintiff used both hands in a normal manner in driving these wood trucks during September and October, 1935, some of these witnesses who had themselves driven trucks stating that a person cannot drive one of these wood trucks in the woods without using both hands. Moreover, several witnesses, whom the trial judge must have believed, testified that they saw plaintiff not only using both hands in driving the truck but also saw him helping load and unload the timber on the truck.

Plaintiff testified that during the time he was hauling this pulpwood in the fall of 1935 his hand was straight but weak, and he could not hold a tight grip in it. Outside of his own testimony and that of one or two of his relatives, none of the witnesses who saw plaintiff when he was hauling this wood testified to any complaint that he made as to any trouble with his hand, nor did these witnesses notice anything wrong with his hand or in his use of it. During this time plaintiff signed several gas tickets in procuring gas for the truck which indicates that he could then use his right hand to sign his name. It is true that plaintiff denies that he signed these gas tickets, but the decided preponderance of the evidence shows that he did sign them.

From the above facts we think it can be safely concluded that in September and October, 1935, 2 or 3 months after the accident, there was little, if any, disability in the use of plaintiff's right hand. He claims that his hand began to draw down in December, 1935, the fingers and thumb drawing down in the palm of his hand and his hand drawing down on his wrist. Several of his relatives testified that plaintiff's hand began to draw down about Christmas, 1935.

Plaintiff's wife left him in December, 1935, but came back the following July. On being asked the condition of her husband's hand when she left him in December,

she answered: "At that time in December it was normal, he complained that he could not grip anything and wouldn't use it. I didn't think anything of it, I just thought it was broke."

One witness testified that in May, 1936, 10 months after the accident, he was with plaintiff on a fishing expedition, and he saw nothing wrong with plaintiff's hand; that plaintiff pulled up a 5 or 6 foot fish net out of the water over into the motorboat with both hands; that plaintiff cranked the motor on the boat with his hands. We do not find this witness contradicted by any one who testified in the case.

The evidence further shows that plaintiff hauled logs in May or June, 1936. It requires the use of both hands to drive a log truck in the woods. During the time these witnesses saw plaintiff hauling logs they saw nothing wrong with his arm nor do they testify to any complaint by plaintiff as to any disability in the use of his arm.

The defendant, James & Co., came back in July, 1936, to complete another road contract, and at that time plaintiff applied for the same job of driving the tractor. The superintendent of this company testified that he saw nothing wrong with plaintiff's hand at that time, although he paid no particular attention to plaintiff's hand. Plaintiff was not given the job, for what reason it does not appear. This suit was filed about the same time—July 14, 1936.

On July 21st, a few days after the suit was filed, plaintiff was examined by Dr. Muir Bradburn, a surgeon who specializes in fractures, and who is regularly employed by the defendant insurance company. His deposition in connection with his examination was taken on October 1, 1936, and the X-ray made for his examination is annexed to his deposition. This doctor found that plaintiff claimed to have lost the sensation in his right hand and fingers and claimed that he was unable to flex and extend his wrist and the fingers of his right hand. The doctor could find no nerve involvements by which this condition could be accounted for, nor did the X-ray show any bone injury or atrophy. Plaintiff led the doctor to believe that his hand had begun to get in its drawn condition after the splints were removed, almost a year previously, but, as the X-ray showed no atrophy of the muscles or wasting of the bone, he concluded that plaintiff must have used his hand in the meantime. The doctor concluded that plaintiff has no disability.

Dr. E. E. Lafferty, of the Bogalusa Hospital, examined plaintiff for the parish welfare director on August 5, 1936. Plaintiff complained of stiffness in his wrist and fingers and inability to use his right hand. Dr. Lafferty could find nothing wrong with plaintiff's arm, wrist, and fingers, and he concluded that plaintiff was malingering.

On motion of defense counsel, the court appointed Dr. E. S. Hatch, an orthopedic surgeon, to examine plaintiff and report his findings to the court as is provided for in section 9, par. 3, of Act No. 20 of 1914, as amended by Act No. 38 of 1918, § 1, and this doctor made his report to the court on October 1, 1936. He states that plaintiff complained of pain in his right wrist and inability to use his right hand on account of stiffness in the movement of his wrist and fingers. Dr. Hatch found no bone or muscle trouble and found that he could flex plaintiff's wrist and fingers normally by the use of his hands, and that plaintiff could do so when under gas anesthesia. Dr. Hatch concluded that plaintiff's trouble was purely neurological. In a supplemental report made to the court by Dr. Hatch on December 8th, he states that, in his opinion, plaintiff is a malingerer and is trying to claim something that does not exist.

These reports of Dr. Hatch have received a rather severe castigation at the hands of plaintiff's counsel. A good portion of their brief is taken up in an argument in support of a motion filed in the lower court to have the findings of Dr. Hatch excluded as prima facie evidence under the above section of the Compensation Law for the reason that Dr. Hatch, in his examination and reports, made use of the previous reports of Drs. Bradburn and Lafferty. We do not think it necessary to pass on this motion, for the reason that Dr. Hatch himself states that the case is a neurological or psychological one and he does not profess to be an expert in this field. However, his findings of fact as to the absence of any bone or muscle injury, together with his findings of the present condition of plaintiff, are entitled to such consideration as the court may see fit to give them. In any event, plaintiff now concedes that the medical testimony, including two of his own experts, shows that he is not suffering from any injury to the bones, muscles, or joints of his hand, but that his present disability is the result of hysterical contracture caused from the original fracture. Plaintiff was examined by Drs. M. D. and Gladys Ratcliff of McComb,

Miss., in October, 1936, and they found that he was suffering from Volkmann's contracture, resulting from an injury to his forearm. They say this contracture usually results from some injury causing fibrous tissue formations which interfere with passage of nerve impulses controlling the movement of the arm. But the effect of the opinion of these two doctors who testified for plaintiff is largely destroyed by two other experts who testified for plaintiff and who state that the trouble is not Volkmann's contracture. In fact, we do not understand that plaintiff is now contending that his disability results from this form of contracture.

Plaintiff was examined by Dr. Emmett L. Irwin, a specialist in surgery, and by Dr. F. L. Fenno, a specialist in nervous and mental diseases, on November 16, 1936. Dr. Irwin found nothing wrong physically with the plaintiff's arm, and he concluded that the trouble was functional or neurological. He found that there was a loss of sensation in parts of plaintiff's right hand and fingers and an inability on his part voluntarily to flex and extend his wrist and fingers normally, but that he could obtain motion in the joints by gentle pressure. His conclusion was that plaintiff was suffering a disability in his hand, but it is apparent that Dr. Irwin gave this opinion largely on the history of the case as given to him by the plaintiff. The doctor was told that after the splints were removed the fingers and wrist began to get stiff and for the past 10 months plaintiff could not move any of the joints of the fingers or wrist of the right hand. From the history given him Dr. Irwin concluded that the present condition of plaintiff's hand resulted from the fracture of the wrist in July, 1935; however, on being asked if it were shown that plaintiff worked after the injury and used this hand in a normal way, he would be of the same opinion, the doctor said that his conclusion that the present condition of plaintiff's arm resulted from the accident was based on the continuity of the condition from the time of the injury. As it is evident that plaintiff did not tell Dr. Irwin of his using his hand for several months after the accident, we think it is fair to conclude that Dr. Irwin's opinion on this point should be modified accordingly.

Dr. Fenno diagnosed plaintiff's condition as hysterical contracture of the right hand. This doctor found no organic nerve involvement in the arm or hand. As there were no nerve lesions, he concluded that the lack of

sensation in the hand was due to hysteria causing what is known as low glove anæsthesia. Hysteria is a neurological condition brought on by various causes, such as physical injury, fright, shock, or worry. There are no physical injuries, but the paralysis is real in so far as the patient is concerned. The condition is mental rather than physical. The opinion of Dr. Fenno was that plaintiff was not malingering or faking his condition, but he could not state as a certainty that the hysterical condition resulted from the injury, but his opinion was that the hysteria was caused from some previous trauma.

Dr. Pierce, a general practitioner, saw plaintiff in October, 1936. He thought plaintiff's wrist presented what is known as a Chauffer's fracture, or a fracture in the wrist joint. Dr. Pierce did not have the benefit of an X-ray picture of the hand, and, as the X-ray picture made for Dr. Bradburn in July did not show any fracture of the wrist, and as plaintiff is not now relying on such a fracture as the cause of his disability, the theory of a present bone injury may be eliminated from the case.

Dr. Warner, another general practitioner, testified that he examined plaintiff's hand in July, 1936, and he found it in a paralyzed condition. Dr. Warner saw plaintiff several times after that on the street and in the drugstore and plaintiff held his hand in the same drawn condition. Dr. Warner thought the condition was a real one and disabled plaintiff from using this hand. The fracture of bones in the wrist could cause the hand to draw down as it did. But the significant part of Dr. Warner's testimony, which the trial court must have believed and which we believe, is the fact that Dr. Warner saw plaintiff frequently, once a week, and treated plaintiff's family, from the time of the injury in July, 1935, until he examined plaintiff a year later, and during that time saw nothing wrong with plaintiff's hand nor did plaintiff make any complaint about the condition of his hand during that entire period of a year after the accident, and not until about the time of filing the suit.

The decided preponderance of the medical testimony shows that plaintiff is suffering no organic or physical injury producing a disability. In fact, plaintiff now virtually concedes this fact. Therefore, the question resolves itself into whether or not plaintiff is affected with a hysteria causing the contracture of his hand resulting from the fracture in July, 1935. The trial judge did not specifically find that plaintiff is suffering from no disability, but his decision is based on the failure of the proof to show any causal connection with the injury, if any disability does exist.

Courts are loath to reach a conclusion that would brand a compensation claimant as a malingerer, for to do so might not only operate as a denial of a just claim, but, worse still, might place the stamp of dishonesty on the claimant's character. The evidence should clearly show a case of faking almost, if not quite, to the degree of certainty as that in the old story of the little boy who cut his foot and a sympathetic and indulgent mother relieved him of doing chores the first night after the injury. The youngster was so delighted in getting relief from these disagreeable tasks that his limping and hopping on the injured foot became more noticeable as the days passed. Finally, the mother became suspicious and noticed, in an unsuspecting moment, that her boy was limping and hopping on the wrong foot. Needless to say, the boy was put back on his job.

The fact that plaintiff has lost sensation in parts of his hand and fingers, and the further fact that he holds his hand in a bizarre and uncomfortable position, seems to have been rather convincing with some of the experts that plaintiff is suffering from hysterical paralysis of the right hand. Other experts were convinced that he has no such hysterical paralysis, for the reason that there are no nerve lesions to prevent the use of his hand if he would use his will power in doing so and from the further fact that he gives conflicting answers with reference to the parts affected by the loss of sensation, coupled with the still further fact that plaintiff has used his hand since the accident. We must be guided largely by the medical testimony in the case. The case of Woodward v. Longino & Collins, Inc. (La.App.) 155 So. 503, 504, presents a situation somewhat similar to the present case, where the court made the following statement.

"In our opinion the decision of this case cannot be made with any profound confidence in the correctness of our conclusion. We are much impressed by the apparent lack of sensation in the plaintiff's arm and hand as demonstrated by the testimony of the experts and the experiments which were conducted in and out of the court. If the plaintiff is not suffering from hysterical paralysis and 'will not will,' he exhibited

250

a most unusual degree of human fortitude which has admirably served his nefarious purpose. If, on the other hand, he is actually a victim of 'functional disturbances of the brain, spinal cord or sympathic nervous system' and, therefore, 'can not will,' he is most unfortunate in not having been able to convince the majority of the medical experts of that fact, for the clear preponderance of the medical testimony is against him."

If the plaintiff is suffering a disability on account of hysterical paralysis of his hand and this condition is caused, directly or indirectly, by the previous fracture, or if the drawn and paralyzed condition has been activated or superinduced by this fracture, he would be entitled to recover compensation. 1 Schneider's Workmen's Compensation Law, p. 609, § 204 a; Wilkinson v. Dubach Mill Co., Inc., 2 La.App. 249; Herzog, Medical Jurisprudence, p. 291.

Plaintiff must prove that his present disability has a causal connection with the injury. The disability resulting from the injury is not presumed to continue beyond the period for which compensation was paid. Dees v. La. Oil Ref. Corp. et al. (La. App.) 162 So. 597; Burton v. Norwich Union Indemnity Ins. Company (La.App.) 146 So. 897.

In the case of Madison Vaughn v. Solvay Process Company, 176 So. 241, this day decided, we affirmed a judgment of the district court granting compensation to an employee for an injury to his wrist which caused paralysis and inability to use his hand. But in that case there was clear evidence of bone injury at the time the claim for compensation was made. We found in that case that the claimant had sufficient bone injury to cause pain in his wrist movements, and that this physical abnormality was sufficient to cause the mental or hysterical attitude which led the employee to exaggerate his disability, and, in addition, the bone injury in that case continued from the time of the accident down to the hysterical affection.

In this case there is not sufficient evidence to show that the bone injury continued down to the beginning of the hysteria, but, on the contrary, the preponderance of the evidence is to the effect that the fracture healed a few weeks after the accident and plaintiff had the normal use of his hand for some time after it had healed. We cannot say but that plaintiff's condition, whatever it may be, might have been caused by another injury subsequently received, or from some other cause. To say that his disability (if we conceded that he has such) probably arose from the fracture of his wrist is not sufficient, as a judgment cannot be based on probabilities, however reasonable they may seem.

We are certainly not prepared to say that the trial judge manifestly erred in reaching the conclusion that he did.

For the reasons assigned, the judgment is affirmed.