## VAUGHN v. SOLVAY PROCESS CO.

### No. 1731.

Court of Appeal of Louisiana. First Circuit.

Oct. 5, 1937.

Taylor, Porter & Brooks, of Baton Rouge, for appellant.

W. T. Bennett and H. M. English, both of Baton Rouge, for appellee.

OTT, Judge.

Plaintiff sues for compensation in the total sum of $2,995.20, with interest, plus medical expenses in the sum of $250, on account of an injury received by him on December 17, 1934, while in the employ of the defendant company. The claim is for

total temporary disability for 295 weeks at $10.40 per week.

The injury was sustained when plaintiff slipped and fell, and in attempting to break the force of the fall plaintiff struck his right hand against a piece of timber measuring 6 by 6 inches. It is alleged that the force and violence of the fall caused the muscles, nerves, tendons, and tissues of the right arm and wrist to become strained, bruised, and wrenched, thereby causing an enlargement of the tissues to such an extent that his right hand, back to the wrist, is so stiffened and drawn that he cannot close his fingers or bend his wrist to the natural position; that he has lost the grip in his right hand; that the injury caused spicules and erosions in the bone of his right arm and wrist.

Defendant admits that plaintiff received an injury to his right wrist, causing a sprain and contusion thereof, while in its employ, and further admits that plaintiff was receiving $16 per week at the time of the injury, and avers that plaintiff was paid compensation from the date of the injury to March 27, 1935, a period of 13 weeks, at $10.40 per week, but that no further compensation is due for the reason that plaintiff sustained no further disability. In the alternative, and in case the court should hold that it was liable for further compensation, defendant asked that it be given credit for $21.70 expended by it for medical expenses in addition to the amount paid for compensation.

The trial court rendered judgment in favor of plaintiff for total temporary disability not to exceed 300 weeks at $10.40 per week, subject to a credit for compensation already paid of $135.20, and for $250 medical expenses, less a credit of $21.70 paid thereon. The defendant has appealed.

The only question at issue is whether or not plaintiff suffered, and is now suffering, any further disability on account of said injury than that for which he has been compensated, and, if so, the nature and extent of that disability.

Outside of the testimony of the plaintiff himself, all of the other evidence is purely medical and expert. We are confronted with the Herculean task of analyzing and, if possible, reconciling the findings and opinions of ten medical experts—four called by the plaintiff and six by the defendant. We are impressed with the thought that, if these ten eminent physicians and medical experts have been unable to determine the nature and extent of the injury sustained by this negro laborer, we fear that the true nature of his condition has little prospect of being known through human agencies. The learned trial judge must have met with somewhat the same bewilderment with which we are confronted by this maze of highly technical evidence, as he has written a rather lengthy and well-considered opinion in an effort to reach a correct conclusion. Likewise, the briefs filed in this court by both sides to this controversy indicate that the attorneys have given the case considerable study and effort, and that they are aware of the difficulty involved in reaching a correct conclusion from the evidence in the case.

Plaintiff was cut off from compensation the latter part of March, 1935. He filed this suit on May 27, 1935, but the last part of the testimony was not taken until May, 1936. The case was argued and submitted in the lower court on March 18, 1937, and judgment was rendered March 29, 1937. Two years had therefore elapsed from the time plaintiff ceased receiving compensation until the judgment was rendered from which this appeal is taken. Much of this delay, we assume, was caused by reason of the medical examinations of plaintiff and the taking of expert testimony in connection therewith.

After plaintiff was cut off from further compensation by defendant, he was examined by Dr. Pipes of Baton Rouge in April, 1935, and in the following month Dr. Pipes began treating plaintiff, and continued to do so from time to time up to the trial of the case.

Dr. Pipes sent plaintiff to the Charity Hospital in New Orleans, where he stayed a few days.

Plaintiff testified that Dr. McHugh, the defendant's physician, treated him during the time that he was drawing compensation from the company; that Dr. McHugh put splints on his arm for about 3 weeks; that the doctor gave him some liniment with which to rub his arm, and also baked his arm with an electric machine. After Dr. McHugh discharged him, he went to see Dr. Pipes.

Plaintiff claims that he has tried to work but cannot do any kind of hard work like rolling a wheelbarrow or chopping wood; that he cannot bend his fingers and wrist, and suffers severe pain when he tries to do so; that his arm, wrist, and fingers

feel numb and paralyzed. He states that he tried to work for the WPA in the early part of 1936, but could not hold a job, even that of night watchman, on account of the severe pain in his arm and wrist.

In February, 1936, more than a year after the accident, plaintiff was examined by four specialists in New Orleans, Dr. J. C. Rodick, a roentgenologist, Dr. Gilbert C. Anderson, a specialist in neurological surgery, Dr. N. H. Polmer, practising physical therapy, and Dr. E. S. Hatch, an orthopedist, or specialist in bones and joints. All of these experts were called by the defendant, but in order to better analyse and understand the other medical testimony we will first consider that of these four specialists.

Dr. Rodick made X-ray pictures of plaintiff's right wrist. According to his report, an examination of the right wrist on anterior posterior, oblique, and lateral projections revealed an area of cortical erosion along the lateral aspect of the semilunar bone as seen in the anterior posterior projection and in the lateral projection; some irregularity of the posterior aspect of the bone as well as a small spicule splinter or nodule—apparently projecting downward from its anterior aspect. On the distomesial aspect of the semilunar there was found an area of cortical erosion which is not as large nor as extensive as that found on the lateral aspect. This doctor ventured the opinion that these eroded areas may be the result of an accident. He also found that the dorsolateral aspect of the scaphoid is irregular, which he thought might be the result of an injury.

On his examination with reference to this report, Dr. Rodick states that his purpose was merely to state what the picture shows and not to assign a cause for the condition nor undertake to prescribe treatment nor give an opinion as to the effect of the condition. However, we must conclude from his examination and report that there is something abnormal in the bones of plaintiff's right arm and wrist. In fact, all of the doctors admit that these pictures show some abnormality in plaintiff's right wrist, but they differ in their opinions as to its cause and its effect.

Dr. Anderson found nothing wrong with the nerves that control movement of wrist and fingers of plaintiff's right hand. He found a slight wasting of the muscles, but no more than would be expected from non-use. Voluntary movements of the wrist and fingers were limited to about 15 per cent. of normal, but there was no paralysis of movement. Sensory examination showed marked reduction of sensation over hand and forearm above wrist. He found that plaintiff had limited motion in his wrist, and says that the spicule and erosions in the bone might limit mobility of the wrist, and that these bone injuries could have been caused from an accident. The doctor could not say whether or not this limited motion was real or feigned by the plaintiff.

Dr. Polmer made a muscle and nerve test of plaintiff's forearm. He asked plaintiff to take off his coat and roll up his sleeves, whereupon plaintiff rolled up the sleeve of his right hand with his left hand, but in rolling up the sleeve of his left hand he did not use his right hand, but caught the left sleeve with his teeth. The doctor noted a marked limitation in the voluntary flexion and extension of fingers and wrist of right hand, but passively the doctor could flex and extend the wrist and fingers for plaintiff without any apparent limitation. The doctor applied the faradic current to plaintiff's arm, which causes the muscles to contract without the volition of the patient, if there is no nerve injury, and under this electric current, applied to the nerves controlling the movement of the wrist and fingers, it was found that the wrist and fingers flexed and extended in a normal range. From this and other tests made the doctor concluded that there were no nerve or muscle injuries to the hand, and he thought there was no permanent disability from any nerve lesion, but whatever the trouble, he recommended physical therapy treatment.

Dr. Hatch thinks plaintiff is suffering no disability; that he is a malingerer. He says that the plaintiff is over-reacting to a minor injury, and he recommended that plaintiff be given physical therapy treatment to get him started back to work. But Dr. Hatch would not venture an opinion as to what caused the spicule and the erosions shown by the X-ray, but he did say that they would not affect mobility of the wrist, even though some of the other specialists stated that these abnormalities of the bone might affect the motion of the wrist. The fact that Dr. Hatch thought that the disability to plaintiff's hand would clear up after 2 or 3 weeks if given the physical therapy treatment indicates that he must have thought there was something

wrong with the hand, even though it was purely imaginary.

Dr. McHugh could find no injury to plaintiff's arm from an X-ray made in March, 1935, but plaintiff then complained of pain in the arm, and claimed that he could not hold a grip with his hand. Dr. McHugh thought that plaintiff was either faking a disability or else he thinks he is disabled. He does not believe the bone injuries shown on the X-ray made by Dr. Rodick in February, 1936, are sufficient to cause any disability.

Dr. Cook of Baton Rouge was the other expert called by defendant, and we will mention his testimony after briefly commenting on the testimony of the four doctors called by the plaintiff.

Dr. Pipes treated plaintiff and had him under observation for a longer time than any other doctor who testified in the case. We therefore feel that Dr. Pipes had a better opportunity to determine whether or not plaintiff is actually suffering a disability than any other doctor, without any intention of comparing the qualifications of these various doctors, all of whom enjoy high standing in their profession.

Dr. Pipes treated plaintiff with electric current—not the high frequency kind—and gave him medicine to relieve the pain in the arm. In the opinion of Dr. Pipes the spicule and bone erosions shown in the X-ray would weaken the wrist and interfere with its motion, causing pain in movement. This doctor thinks the condition of plaintiff's wrist incapacitates him from doing hard labor. He says the condition of the wrist has persisted over a year under his observation and it is worse now than when plaintiff first came to him. He thinks the bone condition is the result of an injury, and this abnormal bone condition is the cause of plaintiff's disability. He does not believe plaintiff is a malingerer because he has these bone lesions.

Dr. Philip Jones examined plaintiff and the X-ray pictures. He says there is definite bone injury shown, and that pain would result in moving the wrist. This doctor does not think the plaintiff is able to do manual labor, and he thinks a cure is possible, but not probable.

Dr. Lee examined plaintiff the day before the trial, together with the X-ray, and he found an enlargement at the end of the ulna, which enlargement can be seen easily. Plaintiff cannot close his hand. He thinks the injury to the hand incapacitates plaintiff from doing hard work, and he could not state how long the disability would continue. He found that plaintiff had loss of sensation in hand, but he thought this loss of sensation was mental.

Dr. Thom, who had an office near Dr. Pipes, examined plaintiff when he first came to see Dr. Pipes, and found a stiffness in the wrist joint. This doctor diagnosed plaintiff's trouble as traumatic arthritis due to injury. The bone injury causes pain in moving wrist. Thinks plaintiff not able to do work where he has to use this hand, and thinks the disability will continue indefinitely.

We now revert to the testimony of Dr. Cook, a witness for the defendant, but whose testimony is so clear and frank that we have given it considerable weight, as did the trial judge, and we think the testimony of Dr. Cook so far corroborates that of the other doctors called by the plaintiff that the scales are decidedly balanced in favor of the reality of plaintiff's disability. Dr. Cook says: "According to the X-ray and the examinations they have made, there are certain changes in the man's hand that are permanent. There is a little spicule of bone broken off; that little spicule should not be there; that is an abnormality. It may never cause this man any trouble; on the other hand it might give him some trouble. It is not enough to incapacitate him completely. There is no question about that. It may not be enough to incapacitate him at all. On the other hand, we have no way of telling how long it may be left a little weak. He should not engage in heavy work or tasks; if he should attempt moving a piano down steps, for instance he might get in the middle and everything would come down. That's the situation as well as I can give it to you."

We think the preponderance of the evidence justifies the conclusion that plaintiff has a sufficient injury and abnormality of the bones in the wrist to impair the movement of the wrist and to cause pain when the movement is attempted. The condition has persisted since the injury and this fact, together with the preponderance of the medical testimony to the effect that the bone lesions are probably due to an injury, justify the conclusion that the present disability results from the injury.

We are not unmindful of the fact that plaintiff not only bears the burden of

proving by a preponderance of the evidence that he is now suffering from a disability of this hand, but he also must prove that the present disability has a causal connection with the injury. The testimony supports both propositions.

■ While the weight of the evidence supports the conclusion that plaintiff is incapacitated from doing hard manual labor because of the physical injuries to the bones of his hand, the weight of the medical evidence also supports the conclusion that his condition is intensified and exaggerated by his mental attitude. If his physical condition resulting from the injury is of such a nature as to cause traumatic hysteria, making plaintiff believe that he could not work for fear of increasing the pain in the arm, he would still be entitled to compensation. The rule is thus stated in 1 Schneider's Workmen's Compensation Law p. 609, § 204a: "Even though an accident may not produce an anatomical pathology, nevertheless if the workman does in fact become disabled as a result of that accident, the injury is compensable, although such disability may be the result of hysteria, and may be traceable to a mental condition and not a physical disorder." See, also, Wilkinson v. Dubach Mill Co., Inc., 2 La.App. 249; Herzog, Medical Jurisprudence, p. 291.

■ Plaintiff is a manual laborer and has no other way of earning a living except by hard work. The full use of his right hand is indispensable in this kind of work. The injury seriously impairs the use of this hand, rendering it impossible for plaintiff to do the same kind of work that he was doing when injured. His capacity to work is affected as is shown by the preponderance of the evidence. His compensation must therefore be fixed under the total disability clauses of the compensation law, section 8, subsection 1 (a) of Act No. 242 of 1928 (page 357), under the authority of Barr v. Davis Bros. Lbr. Co., Ltd., 183 La. 1013, 165 So. 185; Knispel v. Gulf States Utilities Company, Inc., 174 La. 401, 141 So. 9 and others.

■ Plaintiff prayed for total temporary disability for 295 weeks, but the judgment allowed him compensation for total temporary disability during the period of his disability, not to exceed 300 weeks. We do not think the disability payments could extend beyond the period asked for in the prayer. If plaintiff's disability ceases before the expiration of the maximum

period fixed in the judgment, defendant has a remedy under the law for relief. We will amend the judgment to correspond with the prayer of the petition.

For the reasons assigned, the judgment is hereby amended so as to change the period for the weekly payments from a period not to exceed 300 weeks to a period not to exceed 295 weeks, and in all other respects the judgment is affirmed.