86 So.2d 764 (1956)
Willie MAMON
v.
FARNSWORTH & CHAMBERS CONSTRUCTION CO., Inc. et al.
No. 4157.
Court of Appeal of Louisiana, First Circuit.
March 20, 1956.
Rehearing Denied April 27, 1956.
*765 Arnold J. Gibbs, Lawrence A. Uter, Jas. A. Hammers, Baton Rouge, for appellant.
Breazeale, Sachse & Wilson, Baton Rouge, for appellee.
ELLIS, Judge.
In this suit plaintiff is seeking to recover the maximum amount of compensation for total and permanent disability as a result of an alleged accident and injury on or about August 26, 1953 while employed by the defendant, Farnsworth and Chambers Construction Company, Inc., as a common laborer in the construction of an extension and addition to Louisiana State University football stadium.
The defendant denied generally the allegations of plaintiff's petition but admitted that plaintiff claimed he injured himself on the date alleged. Defendants specifically deny that plaintiff ever suffered any disability as a result of the accident.
After trial the Lower Court with oral reasons dismissed plaintiff's suit. Counsel for defendant in his brief states that in the oral reasons the lower court dismissed plaintiff's suit because he had failed to discharge the burden of proof as to disability, and, secondly, that if he was disabled plaintiff had not proven a causal relation between his disability and the alleged accident on August 26, 1953. From this judgment of the Lower Court the plaintiff has appealed.
While the accident was not specifically admitted, it is sufficiently proven within the contemplation of the Act. It is shown that a wooden "form" for pouring concrete, or a "panel" made of wooden planks fell on the plaintiff on the date alleged. The witness whom plaintiff placed on the stand to prove the accident testified that the form fell upon the plaintiff, knocking him to the ground, and that he saw three or four men lift this form off of the plaintiff. Plaintiff, in giving the history of the accident to one of the doctors, referred to it as a "column" of wood which fell on him. This difference is immaterial as an accident is proven to have happened to the plaintiff on the date alleged. The main question is the effect, that is, whether the plaintiff suffered any disability at that time or shortly thereafter and the extent of the disability.
The main question to be decided in this case is one of fact as to whether plaintiff is suffering a traumatic neurosis or, as diagnosed by Dr. McGruder, a psychiatrist, a "conversion hysterical reaction."
As of the date of the trial plaintiff had no objective symptoms to support his complaint of pain in his back and leg and his alleged disability.
It is shown that the day following the plaintiff's accident he went to see Dr. McVea who handled such cases for the defendant company. At that time Dr. McVea stated that the plaintiff told him a two by eight fell on him and strained his back and legs and that he was suffering pain in both. Dr. McVea examined the plaintiff on three occasions, viz., the 31st of August, and the 3rd and 4th of September, 1953. He could find no objective support for plaintiff's complaints, and his findings were negative insofar as tenderness in his back, muscle spasm, limitation of motion and any reflex changes in his extremities were concerned. On the date of Dr. McVea's last examination plaintiff was still complaining but he again found no objective symptoms to support such complaints. It was Dr. McVea's opinion that the plaintiff was exaggerating his complaints and that they were not compatible with the injury which plaintiff claimed he sustained and he did not feel that plaintiff was hurt as a result of the injury which he *766 described. Dr. McVea thought that there was a strong possibility that the plaintiff was malingering. On the date of the trial Dr. McVea had not examined this plaintiff since the fourth of September 1953. (The date of the trial was May 11 and 12, 1955) Dr. McVea stated, however, that he found some muscle spasm in plaintiff's back but he reached the conclusion that it was voluntary. On cross-examination Dr. McVea was asked whether a psychiatric problem caused or brought into being by a trauma would necessarily manifest itself within the short period of time in which he saw the plaintiff and he answered not necessarily, although it could manifest itself within that short period.
Dr. Thos. Campanella, orthopedic surgeon of Baton Rouge, examined the plaintiff on September 15, 1953 at which time the latter was complaining of pain in the groin and down the spine and down the right leg. Plaintiff told the doctor that the pain originated in August 1953 while lifting a four hundred pound weight that fell on his left shoulder. Plaintiff was given a routine back examination and upon the doctor's advice was admitted to the Lady of the Lake Hospital where a myelogram was performed. Dr. Campanella stated that the plaintiff was lawfully sensitive and quite nervous, for during the procedure necessary to perform the myelogram plaintiff nearly jumped off the table, and he felt that the complaints of the plaintiff as to the pain caused by the test were exceedingly exaggerated. The test itself was negative. Dr. Campanella further testified that on September 24, 1953 he saw plaintiff at his office "at which time I gave him a shot of B-12 to calm him down a little." On this date Dr. Campanella felt that he was in a position to diagnose plaintiff's condition and he testified that his diagnosis was "acute sprain of the lumbo-sacral joint with strain of the right para-vertebral muscle mass," and that he felt plaintiff "had a residual disability of approximately 10% loss of the use of the back, temporary in nature," and he based this diagnosis upon objective findings which consisted of "tenderness over the lumbosacral joint, spasm of the right paravertebral muscle mass, positive Patrick test, Lasague signs and straight leg raising test." He did qualify the above quoted testimony somewhat by stating that plaintiff, when he came to him, was wearing a lumbosacral corset which tends to make the back a little stiff and tightens the muscles, and that it "could be the cause for not getting well, and could cause a condition of the back which assimulates spasm, and that is tightness." It was his opinion that "any injured muscle should respond to treatment of rest and heat, and I felt that in four to six weeks he should have gotten well."
While it might be considered placing the "cart before the horse" in discussing the defendant's testimony prior to that of the plaintiff, it was deliverately done for the sake of brevity in arriving at a conclusion as to whether the plaintiff suffered any injury as a result of the accident.
Taking the testimony of Dr. McVea and particularly the testimony of Dr. Campanella, it is shown that plaintiff did suffer an injury as a result of the accident. It is true that according to their testimony ordinarily the disability would have been temporary in a normal person but it is well settled that whether a plaintiff's condition is caused by a mental disorder or a physical disorder is immaterial if either is brought on by the accident while in the employ of the defendant and while acting within the scope of his employment. Wright v. Louisiana Gas & Fuel Co., La.App., 140 So. 712; Louisiana Workmen's CompensationLaw and Practice, by Wex S. Malone, Professor of Law at Louisiana State University; Section 276, page 337; Mitchell v. T. L. James & Co., Inc., Vaughn La.App., 176 So. 245; Vaughn v. Solvay Process Co., La.App., 176 So. 241; Peavy v. Mansfield Hardwood Lumber Co., La.App., 40 So.2d 505; Lala v. American Sugar Refining Co., La.App., 38 So.2d 415; Vega v. Higgins Industries, Inc., La.App., 23 So.2d 661; Clifton v. Glassell-Taylor Co., La.App., 19 So.2d 590; Porter v. W. Horace Williams Co., La.App., 9 So.2d 60; McCastle v. Architectural Stone Co., La. App., 4 So.2d 120.
*767 In support of plaintiff's case Dr. L. F. McGruder, psychiatrist, testified that he examined the plaintiff on March 28, 1955 and that he obtained the history of plaintiff's trouble from him, and the only objective symptoms or complaints he noted was restlessness; tremors of the extended hands and fingers, moisture of the palms and plaintiff appeared to be "apathetic, depressed, unhappy." He was cooperative with the doctor but in stating his history he showed a hostility toward various doctors and his attorneys. He walked in a stooped position with a slight limp and favored his right leg and was using a cane. Dr. McGruder stated that he did not do a complete physical examination on plaintiff but he did a "psychiatrical." It was his opinion that the depression which the plaintiff was suffering from was "superimposed upon a conversion hysterical reaction." When asked what he meant by the latter term he stated:
"Q. What do you mean by conversion hysterical reaction? A. Well, in this process that he complains of, of back pain, a sense of numbness and at times a sensation of prickling pins and needles, along with a morbid fear that he would never get well, would indicate that he had what is known as conversion hysterical reaction, and that it is entirely possible that the disuse you might say or the abnormal use of the right leg could be projected from a psychological point of view to that limb to believe that it was definitely injured.
"Q. Did he appear to you to be sincere in his complaints? A. Yes, I was convinced that he was honest and truthful because the fact is on several occasions I asked him questions that it would no doubt have been to his advantage to have admitted where he denied.
"Q. Was the disability that he spoke to you about, did it appear to you that it was real to him? A. Yes, I think that he definitely feels that he has a physical disability. I don't think that he realizes that it is arising from the emotional field."
Dr. McGruder also stated that "conversion reaction" is essentially the same as traumatic neurosis or post-traumatic neurosis. He very definitely was of the opinion that plaintiff was suffering from such a condition. It is to be noted that Dr. McGruder also stated that his condition has to do with the "unconscious desire for secondary gain, and if the emolument is withheld it has a tendency to make it grow worse." The fact that plaintiff's desire for secondary gain is unconscious distinguishes his condition from that of a malingerer whose desire for secondary gain is conscious. It was Dr. McGruder's positive opinion that as a result of plaintiff's condition, which in his opinion was connected with the accident and injury, the latter was totally disabled.
Although the defendant contends that the plaintiff is merely attempting to get compensation, it is shown that compensation was paid to plaintiff for 31 weeks and there is no evidence in the record that the plaintiff's condition was different during the time he was receiving this compensation than it was subsequent to its discontinuance. Dr. McGruder's testimony under cross-examination as to the causal connection between plaintiff's accident and injury and his mental condition was given in the following answer:
"A. Well, my opinion was he had a depressive reaction superimposed upon a conversional hysterical reaction, presumably traumatic in origin. That's the way I have it here, and that was based on the history that I got from him, and we are forced to accept histories as being within reason reliable as to certain statements."
Dr. George, an orthopedic specialist, testified that he first saw and examined plaintiff on Nov. 9, 1953 and that he found the circumference of the right calf 12 inches and of the left calf 13 inches, and plaintiff complained of some tenderness on palpation over the lumbosacral joint. He also made other objective findings of "slight muscle spasm on the right side of the lumbar region." He caused the plaintiff to be placed *768 in the Baton Rouge General Hospital with Buck's extension, which is a traction or pull on each leg of five pounds, for approximately seven days, and in addition he prescribed heat treatment on the lower back, and when the plaintiff left the hospital he was wearing a low back brace. He re-examined plaintiff on Nov. 13, 1953 and found an area of hypoesthesis over the lateral surface of the left leg and ankle and suggested another myelogram and the Buck's extension. The doctor did not testify exactly how many times he had seen the plaintiff but on Feb. 25, 1954 he wrote a letter to counsel for plaintiff in which he stated in part:
"In accordance with his impression that he had a disc, I requested Dr. Joseph Sabatier to do another myelogram on February 23, 1954. This is negative, and under the circumstances it is my impression that the worst that this patient had was a lumbosacral strain. Since he does not feel he is improving, I do not feel that treatment continued beyond this would be of any benefit to him. I do feel that a settlement of some type would probably be very beneficial to him."
Dr. George testified that the plaintiff was a very good patient and that he "was very sincere, I believe."
Thus we see that this doctor found some objective symptoms of an injury to the plaintiff but could not substantiate plaintiff's complaints with any objective finding; and suggested discontinuance of plaintiff's visits or treatment by him because plaintiff did not feel that he was improving, although Dr. George thought that the plaintiff was very sincere. There is no suggestion in his testimony that plaintiff was a malingerer. He refused to be interrogated as to whether the plaintiff was suffering from a traumatic neurosis as a result of his injury as that was not within his field.
Dr. Moody, a general practitioner of Baton Rouge, saw plaintiff three times beginning September 3, 1953 at which time he was complaining of pain over the lower portion of his back over the sacro-iliac and lumbo sacral joints, especially on the right side, and over the paravertebral muscles and also some pain radiating into the right groin. It was the opinion of this doctor that plaintiff was suffering from a torsion type injury. The other two visits by the plaintiff were made on September 12 and October 15, 1953, respectively, and the doctor testified that his notes on the last examination stated that the patient was no better "and that on check he had a stocking type of anaesthesia above the right knee which in my opinion was purely hysterical in character." This doctor gave a lengthy explanation of the meaning of "stocking type anaesthesia" which it is not necessary to give in detail. This doctor also testified that he told counsel for plaintiff in October 1953 that the latter needed psychiatric treatment. Dr. Moody's unpaid bill amounted to $45.
Dr. Gilliland, a psychiatrist, testified that he examined the plaintiff on two instances in May of 1954, each examination consisting of approximately 45 minutes. The defendant argues that the time spent in each examination was too brief, however, there is nothing in the record that even suggests that an hour and a half would not be sufficient time in which to make such an examination. On the second visit the plaintiff was placed under sodium pentothal, which is one of the so-called forms of truth serum. This doctor compared the examination with and without the truth serum and testified as follows:
"A. Primarily, under the influence of pentothal he showed a rather striking change in his behavior and his general attitude. During my first interview with him he tended to over-dramatize his movements. He had a somewhat surly and antagonistic attitude, was inclined to be rather unresponsive, and was mostly preoccupied with the fact of his injury and his physical complaints, expressing a good deal of resentment about what had happened to him. Under the influence of pentothal his attitude very spontaneously changed to one of profuse weeping, with a tremendous amount of self pity and anxiety about his disability and his feeling of being disabled and his lack *769 of capacity to do anything to help himself or to get anyone to understand that he was actually suffering.
"Q. Did you learn anything else from him while under the influence of this drug? A. Only that the historical facts which he incidentally recounted while under the influence of the drug were compatible with the ones he gave to me during the waking interview.
"Q. Then would you say that the drug actually had the effect on him which you would expect it to have, that is induce him to give an accurate account of what had happened to him or what he actually felt? A. Well, the primary purpose of using a drug like this is to at least partially inactivate ordinary working character defenses so that you can get some picture of what the individual is really like and how he operates in his ordinary settings.
"Q. Getting back to your letter, I wonder if you would read the last paragraph to us? A. `On the basis of his performance under pentothal narcosis, I felt quite certain that his difficulty represented a hysterical conversion reaction in an infantile and dependent character. I do not feel that he is malingering, but the most important thing in his existence has become the issue of compensation for his disability. Regardless of how much or how little physical disability he has at the present time, from an emotional standpoint he is at present totally disabled. The longer some type of compensation or settlement is denied him, the more intrenched his symptoms will become. I do not feel that any form of treatment will be effective until the question of financial settlement has been concluded once for all. Once this is accomplished, I would anticipate that he will have an uneventful recovery if there is no actual physical disability present.'
"Q. Doctor, is it your opinion after your interview with this patient that he was totally disabled at the time you saw him? A. That he had a total emotional disability, yes." Dr. Gilliland stated that conversion reaction simply meant that some emotional conflict or attitude had been converted into a physical symptom which could cause the type of disability and pain complained of by the plaintiff. He testified that he could not say with positive certainty that plaintiff's emotional disability was due to the accident of August 23, 1953, but he testified: "It is probable and it is my opinion it was the precipitating factor."
Dr. Benitez, doctor of internal medicine, treated plaintiff over a period of approximately eight months and testified that plaintiff "seemed to walk with greater ease." He stated that he found no evidence of insincerity in plaintiff's behavior. It was his opinion that the plaintiff was handicapped in part, he could not state exactly how much, as a result of the injury sustained and part of his handicap was on a psychosomatic basis.
In addition to the medical testimony we have the testimony of plaintiff himself and lay witnesses who testified that he was a normal human being prior to the accident and a good worker, and that since then he apparently had been disabled.
Plaintiff has proven an accident, some injury to his back as a result thereof, and the record is most convincing that the mental condition which developed in this plaintiff is definitely a result of the accident and injury, and that at the date of the trial he was totally and permanently disabled within the meaning of the Compensation Act as interpreted by the authorities hereinabove cited.
It is therefore ordered that the judgment of the District Court be annuled, set aside and reversed and that there now be judgment in favor of the plaintiff in the sum of $30 per week payable weekly beginning August 26, 1953 with 5% on each past due installment from maturity for a period not exceeding 400 weeks, subject to a credit of compensation previously paid in the sum of $930.
It is further ordered, adjudged and decreed that plaintiff have judgment against *770 the defendant in the full sum of $45 medical bills together with 5% interest from judicial demand until paid. This is the only amount proven to be due and unpaid.
It is further ordered that the defendants pay all costs.
Judgment reversed.

On Application for Rehearing.
PER CURIAM.
Plaintiff-appellant calls to our attention in his application for rehearing that we failed to allow him more than $45 medical expense incurred by him, although allegedly he had introduced receipts and testimony as to certain additional such expense. We find that the following additional items are supported by proof as for treatment for injuries resulting from the accident: Dr. Leo S. Butler, $5; Dr. David S. Malen, $5; Snell's Limbs & Braces, $0.51; total, $10.51.
The other proof of medical expenses allegedly incurred is not certain and definite enough for us to render a judgment based thereupon. (For example, Dr. Benitez, who undoubtedly treated plaintiff for alleged injuries arising from the accident testified as to the balance owed him, "I think it was $85.00 or $90.00"; he did not have his records with him.) We will, however, reserve unto plaintiff the right to claim such medical expenses within the statutory limits.
Plaintiff-appellee also suggests to us that the fees of the expert witnesses who testified were not fixed either by us or the trial court. Such expert witness fees are fixed by the court "with reference to the value of the time employed and the degree of learning or skill required", LSA-R.S. 13:3666. "Since there is no evidence in the record as to the value of the time employed by the experts who testified in this case, we think this matter should be referred to the lower court for determination", Hemphill v. Tremont Lumber Co., 209 La. 885, 25 So.2d 625, at page 629. "The trial court is in a better position to determine the value of the expert fees than an appellate court, and it can be decided on a rule to tax such fees as costs", Meyers v. Alexandria Coca-Cola Bottling Co., Ltd., La. App., 1 Cir., 8 So.2d 737, at page 739.
For the above and foregoing reasons, the judgment previously rendered is amended to increase the award for medical expenses incurred by plaintiff from $45 to $55.51, together with legal interest; and to reserve unto plaintiff the right to claim other such medical expenses incurred by him for treatment for the injuries resulting from the industrial accident herein, within the statutory limits. In all other respects, we adhere to our original decree herein, although the case is hereby remanded to the District Court for the limited purpose of fixing the fees of the experts who testified in this case and taxing such fees as court costs. All costs to be paid by defendants-appellees.
Both applications for rehearing are denied.