### 25050. SWIFT & COMPANY *v.* WARE.

DECIDED MAY 1, 1936. REHEARING DENIED JUNE 18, 1936.

*Smith, Smith & Bloodworth, William H. Smith,* for plaintiff in error.

*Jo Johnson,* contra.

GUERRY, J. On November 11, 1930, George Ware, while in the employment of Swift & Company, was injured. According to the report of the attending physician, the injury was a "fracture of the right clavical at junction of middle and outer third, contusion of head, right shoulder, and both hips. . . Likely to be able to resume his former work in three or four weeks." An agreement for the payment of temporary total disability was entered into between the employer and employee on December 15, 1930, and this agreement was approved by the Department of Industrial Relations December 30. On March 16, 1931, the claimant notified the Department of Industrial Relations that he and his employee had been unable to agree as to his recovery. At this hearing, on April 1, 1931, Dr. Cochran testified that when he first saw the claimant he was at his home in bed and made no effort to use his right arm and leg. He had him placed in a hospital and by "suggestion and massage" in 5 days time he was moving his right arm and walking, and showed great improvement without any treatment but suggestion; that because of this result the witness felt that the claimant had no "organic pressure on his brain causing the paralysis, and I felt it was a functional neurosis:

he had it in his mind that he could not move that side. . . I felt he would be able to go back to work. He has got to get it out of his mind by suggestion." Dr. C. W. Roberts testified that the claimant came to his office, supported by two attendants. A general examination disclosed no physical or organic disease, but revealed findings such as are associated with a so-called functional neurosis, expressing itself in the form of a partial right-sided hemiplegia. The claimant complained of an inability to raise his right leg from the table or to move his right arm. "This claimant is suffering from a psychoneurosis manifesting itself in the form of a right-sided hemiplegia—sometime spoken of as hysterical paralysis. The condition was provoked by the injury sustained, and is in effect therefore a disability resulting from the injury, although the claimant evidently is by nature constitutionally unfitted to bear the stress and vicissitudes of life. He is totally incapacitated for competitive work, the period of incapacity can not at this time be determined." In explaining that claimant's condition was not entirely of the mind, he further testified: "The normally functioning man is using three separate and distinct faculties working in harmony. One is the physical pattern of the tissues, muscles, bones, blood vessels, ligaments—comparable to the bricks in the wall, a physical structure. And another is the mind which is the highest faculty and when under control the guiding faculty, and then an intervening link known as the subconscious nervous mechanism that is normally submerged with the mental faculties in control. This particular patient, so far as I can see, has a normal pattern of the body so far as physical makeup is concerned. He has a sluggish mentality probably by inheritance. He has the subconscious or so-called sympathetic nervous mechanism that is highly developed. I might say that the tendency to a reversion to control by the sympathetic nervous mechanism that is not controlled by the mind tends to increase as the race more closely approaches the aborigines; so that we find in the colored individual a more potent subconscious mechanism than we have in the higher races. [The claimant was a colored man.] . . If this man could exercise his higher faculties of mind rather than be under the control of the subconscious mechanism, then he would get up and go to work, but he has no will to use his higher faculties that have temporarily been lost. . . In some cases

there are cures, yes, but unfortunately patients that are subjected to medical legal study are usually made by virtue of the study and discussion and all that goes on in connection with an attempt to adjudicate their cases—that usually makes these cases difficult to cure." Such patients "have the ability if it can be energized. Now, if something could be done to restore confidence in this man that he can do these things, whatever that may be, Christian Science or suggestive medicine or some use of a magic wand or whatever may be the tricks that are necessary to release the pent-up energizing force, then this man will be able to work again." Dr. Roberts was asked, "There is no doubt in your mind that this man is not a malingerer?" To malinger, according to Webster, is "to feign illness or inability to work." In reply Dr. Roberts said: "I made a faithful effort over a period of ten years with this commission and for some years before to try and understand the mechanism that underlies the so-called malingerer, and so far as I can say now, in the light of that experience, I have never seen a malingerer, that is, in the sense that a malingerer is an individual in the possession of normal faculties with a machine that is responsive to mental faculties and that person wills to lie down and fake sickness. I think most of the cases are mixtures; their condition is partly exaggerated but the foundation is without their conscious control. . . To the medical mind the mechanism of the condition that lies before you this afternoon is just as real and just as logical and obtains as in a man who has a fractured femur and by virtue of that fracture is unable to raise his leg from the table. The only mistake is that we have so long been able to see only the obvious. The lay mind can grasp a broken leg without medical study, but the lay mind does not understand and can't grasp the subtle condition we are dealing with now." The testimony then entered into a discussion of the place of the subconscious mind in its relation to a perfectly normal individual. The doctor illustrated further: "I left the farm as a boy of about fourteen and went to clerk in a general dry goods and grocery store at a nearby town. A recent development was a railway in the town that ran immediately by the end of the store. The first two or three weeks while I worked in the store every time the train passed it sounded to me like it was running into the building. After three weeks I never heard the train pass. A man at work is not

receiving from the tissues of the body impulses that constantly flow; they do not reach the consciousness of the patient as he is engaged in interests that focus his attention to conditions outside of his body. He sustained an injury and was overcome with fear and he lies down; his attention is arrested from the outside and focused upon the inside; he now begins to feel impulses which existed before but which he did not comprehend on account of his outside interests. These impulses he now receives are real and are to him disabling. Now, if something could be done to focus his attention to external rather than the internal, this man would get better." He further testified that a natural result of a failure to use an arm or a leg was for it to atrophy and that this condition would increase with time. The right suggestion which would energize his mental faculties might cause a recovery, but "Fear underlies it. Fear is the most potent attribute that the human possesses, fear in some form. That man thinks he is paralyzed. Now, he thinks he won't be here long because he has had certain pains around his heart which to him mean he will get the same paralysis in the arm and leg in the heart, and paralysis of the heart means death. He is under the dominion and control of the sympathetic or subconscious nervous mechanism which is a patho-. logical influence coming into his mentality, and there are influences just as malignant to the health in the nervous mechanism as if it was a cancerous tumor in his stomach." At the conclusion of this hearing on May 15, the commissioner found that the claimant was "entitled to compensation as for temporary total disability, the same to continue during disability." Compensation was therefore continued as originally agreed upon, and on August 12, 1931, the employer requested another hearing on the ground of a change in condition and also requested that it be allowed to discontinue payments until after the hearing. By the order of the commission, the claimant was again examined by Dr. Roberts, and on August 27 he reported that since his first examination some five months before he had had the patient under observation "and following a line of treatment administered to this patient by Dr. Newberry under hospital surroundings the patient appeared at my office stating that his symptoms had almost completely disappeared. At that time he had normal use of his right leg and was able as well to use his right arm within essential normal limits. This improve-

ment, however, did not continue, but on the contrary symptoms similar to those reported on April 2, 1931, returned involving his right arm. The improvement in the right leg, however, was maintained, but recently there is again complaint of lack of normal use of the right leg. He came to the office on this visit accompanied by his wife, and is able to get about without aid, walking in a fairly-satisfactory manner. He alleges however, at this time, that he can not use his right arm, or the right hand, that he has numbness in the member, weakness about the right shoulder, and stiffness about the neck. He also complains of weakness and pain in his back as well as weakness and inability to normally use the right leg. Examination again reveals evidences of a functional neurosis complicated by an obvious degree of conscious exaggeration, that is, there is no organic explanation for the alleged weakness in the right arm, back, and leg, but the condition grows out of an hysterical state, or so-called functional neurosis. . . Measurements of the extremities show no atrophy. . . X-ray examinations of the cervical and dorsal vertebrae show no evidence of injury to the spinal column in these segments such as might interfere with nerves passing from this area of the spinal column into the right arm or the right leg. . . In the light of my contact with this claimant off and on, since my first examination, it is now my opinion that there is in this case a measurable degree of conscious exaggeration of symptoms, a degree of malingering. I believe this claimant able to return to selective employment." On a hearing had on October 28, 1931, Dr. Roberts testified: "A hysterical paralysis is either a conscious or unconscious inability to use a part. Some of these hysterical paralyses are due to a belief on the part of the individual he can't use his muscles, and the inability to use them is in that instance due to conviction in the mind of the individual that he has a paralysis, in which event we call it an unconscious type of malingering, and in my first examination and my first report it was my belief, although there was a noticeable amount of conscious malingering in the case, my mind was not convinced that it was pure malingering alone, and I looked upon and so testified that it was mixture of both unconscious and conscious malingering, but in keeping with the feeling of all of us in cases of this kind we gave him the benefit of a doubt and stated he had a hysterical paralysis, which means he had

a functional paralysis over which he had no conscious control, that had grown out of the accident." That the suggestive treatment given him at the hospital was the administering of a harmless drug which would have no possible effect on the disease but made the patient believe that it was a rare medicine, and as a result of this mental suggestion he became normal to such an extent that he was carried by the doctors before a medical clinic as an example. The claimant stated to Dr. Roberts that he "felt the stagnated blood break loose in his right side, and although it hurt him considerably he now feels fine." Dr. Roberts further testified: "The cause of the factor which brought about the first nervous state and the second nervous state would be different; the cause of his first nervous condition or hysterical paralysis was the belief on his part he had sustained an injury. Under suggestive treatment the ability to use the part which he believed to be paralyzed was reëstablished in his mind, and he again used his arm and leg in the normal way. Now, the factor that brought the paralysis in the second event was a different one, the first one being injury and the second being a desire to continue to draw compensation, a so-called 'compensatory neurosis' or a simple defense reaction on the part of the individual to again present those signs and symptoms which in the first instance drew compensation for him; so therefore, while the condition became again the same, the factors that produced it were different. Now, in my conception the first was compensable, and he should have had and did draw compensation, but the second factor is not a compensable factor. It is a social affair that probably grows out of want and need and desire for food and clothing and support of his family, which of course is not a factor growing out of an accident." There was other evidence at this hearing that a short time prior to the hearing the claimant became angry with his wife and held her with his left hand and beat her with his right. On December 22, 1931, the commissioner found that this "is a case of malingering due to his desire to obtain compensation, and instead of being one of traumatic neurosis becomes one of compensation neurosis. . . This claim for compensation is therefore denied and case is dismissed." No appeal was taken from this decision. In July, 1933, a claim was filed by the claimant on the ground of a change in condition, and Dr. Roberts again made a report as follows: "There has been no change in this

claimant's condition since my last report. . . The findings in this case again confirm my diagnosis previously made, namely, an hysterical paralysis of the right arm and to a lesser degree of the right leg with a numbness of the right side of the body. This condition is associated with a degree of malingering, in my opinion, although such conditions grow out of comparatively simple injuries and are in effect disabilities resulting from injuries. The claimant in his present state is incapacitated for competitive work." Dr. R. E. Newberry testified on this hearing as follows: "It is my opinion that there has been no change for the worse; he has no paralysis; he has no atrophy of the muscles; this man could work if he wanted to." The claimant introduced evidence to show that he was almost totally paralyzed on his right side and utterly incapacitated to perform any labor. The director found after the hearing that there had been no change in condition, and for that reason refused further compensation. This finding, upon appeal, was affirmed by the full board. Upon an appeal to the superior court the decision of the director was reversed because without evidence to support it and for a lack of specific findings of fact, and the case remanded for another hearing.

In the act setting forth and creating the Department of Industrial Relations and the workmen's compensation law it is plainly provided that findings of the industrial commission upon questions of fact are conclusive where they are supported by any evidence, and can not be reviewed in an appellate court. There was evidence before the commission at the hearing in December, 1931, that the claimant had recovered from the effect of the original injury and the injury with which he was suffering at the time was from the effects of a "compensatory neurosis," and for that reason compensation was denied. It will be borne in mind that the only compensation that had theretofore been awarded was for "total temporary disability." If as testified to by the doctors there had been a recovery from this hysterical paralysis which was induced by the original injury and the relapse was a form of malingering and was a result of "compensatory neurosis," as defined by the evidence, then in that event the injury then existing was not a disability that arose out of and in the course of claimant's employment. The evidence at the hearing in December, 1933, supported a finding that the injury and the cause thereof were no different from that found

in December, 1931. It was error for the superior court to remand the case.

*Judgment reversed. Broyles, C. J., and MacIntyre, J., concur.*