99 So.2d 511 (1957)
Clarence W. MILLER, Plaintiff-Appellant,
v.
UNITED STATES FIDELITY AND GUARANTY COMPANY, Defendant-Appellee.
No. 8737.
Court of Appeal of Louisiana, Second Circuit.
December 19, 1957.
Rehearing Denied January 21, 1958.
Writ of Certiorari Denied April 21, 1958.
*512 Polk, Foote & Neblett, Alexandria, for appellant.
Gist, Murchison & Gist, Alexandria, for appellee.
HARDY, Judge.
This is a compensation claim in which plaintiff seeks an award as for total permanent disability. Plaintiff appeals from a judgment rejecting his demands.
There is no dispute as to the occurrence of the accident and the existence of a period of disability as the result of a physical injury. The basis of plaintiff's claim rests upon the contention that he has suffered a "post-traumatic neurosis" or a "conversion hysteria", as the result of the accidental injury suffered in the course of his employment, which has effected total permanent disability to perform manual labor.
Three issues involving questions of both fact and law are presented by this appeal:
(1). Has plaintiff succeeded in establishing by a preponderance of the evidence a continuing disability attributable to the existence of some form of neurasthenia, which is related to his injury?
(2). If the above question is answered in the affirmative, upon what basis should plaintiff's recovery be computed?
(3). In the event plaintiff is entitled to judgment, should statutory penalties and attorney's fees be awarded?
The material facts in connection with plaintiff's employment and injury were stipulated by counsel. Plaintiff, an eighteen-year old white youth, working as a common laborer in the employ of defendant's insured, Christoff Keller, who was engaged in the conduct of farming operations in Rapides Parish under the name of Inglewood Plantation, sustained an accidental injury on June 7, 1955, while engaged in the course and scope of his employment. At the time of the accident plaintiff was engaged in a hazardous employment within the provisions of the *513 Louisiana Workmen's Compensation Law, LSA-R.S. 23:1021 et seq., specifically, in the operation of a power saw. A falling tree struck plaintiff, causing a fracture of the tibia of the right leg (erroneously described in the testimony of Dr. Banks as a fracture of the left tibia). Defendant, insurer of Keller, under the provisions of a standard workmen's compensation insurance policy, made compensation payments to plaintiff for a period of forty-three weeks subsequent to the occurrence of the accident at the rate of $26.32 per week, together with medical and hospital expenses. It is noted that defendant does not admit the correctness of the amount of the weekly payments, but, on the contrary, contends that this rate represented an overpayment for which it claims additional credit in the event of judgment in favor of plaintiff.
In addition to the above facts as stipulated, other pertinent facts were established on trial, as follows:
That the injury sustained by plaintiff was treated by Dr. T. E. Banks, Jr., an orthopedic surgeon of Alexandria, by a closed reduction of the fracture and the application of a long leg cast, which was removed on July 25th and a short leg cast then applied, which was removed on August 22nd, at which time x-rays demonstrated an incomplete healing, and further treatment required the use of crutches; that residual evidences of injury consisted of normal stiffness and soreness of the joints and a condition of atrophy of the limb, for which exercises and physiotherapy were recommended by Dr. Banks; that the condition of the injured leg steadily improved until the 30th of March, when, after examination, plaintiff was finally discharged and pronounced fit to return to work by Dr. Banks. Plaintiff consulted an attorney, and, at the latter's request and direction, was examined on May 14, 1956, by Dr. A. Scott Hamilton, an orthopedic surgeon of Monroe, who concluded that plaintiff was suffering from a disability due to a nerve injury, probably resulting from pressure caused by the healing callous, and this doctor recommended that plaintiff be encouraged to return to some form of light work which would not require prolonged walking or standing. Being informed that plaintiff continued to have trouble, Dr. Banks requested that he return for another examination, which was made on June 1, 1956, and his findings were negative with respect to any objective evidence of residual physical injury, although Dr. Banks did note the presence of what he described as a "stocking hyperesthesia." It was established by a number of witnesses, and by the examining medical specialists, that plaintiff continued to evidence a slight limp of the right leg in walking, and, in his testimony, Dr. Banks commented upon an exaggeration of this impediment, on the occasion of his re-examination in June, 1956, which he described as a "grotesque" gait, a condition much worse than had been apparent at any time theretofore. As to his final opinion following the June examination, Dr. Banks testified:
"From strictly an objective standpoint, on the basis of any positive findings, that I could see, I couldn't explain any reason for actual disability in the extremities and when the X-rays previously showed the bone healing, the muscle mass had returned, the joint motion was full, there were no circulatory or neurological discrepanciesso I felt that the man could return to work, strictly from the objective findings."
As the result of his observation during the trial of the case, the learned district judge, in his written opinion, commented that plaintiff
"* * * walked with the right foot turned inward with an extreme limp and dragging of the foot, the gait appearing to be `grotesque', to use the expression of Dr. Banks."
On June 11, 1956, plaintiff was examined by Dr. Davidson Texada of Alexandria, *514 a specialist in neurology and psychiatry, who made another examination of plaintiff on September 20, 1956, shortly before the trial of the case on September 25th. Upon the basis of his examination Dr. Texada diagnosed plaintiff's condition as being a "conversion hysteria" accompanied by a "possible" neuritis, as to which latter condition, however, he refused to make a definite diagnosis. When questioned as to the cause of plaintiff's condition of hysteria, Dr. Texada testified:
"A. I think it's based primarily on the injury that he received to his leg and the period of disability and any conversion hysteria is usually prolonged by the desire of the patient to convince himself that something is actually, physically wrong with the leg itself. This is a particular stress that comes that the patient for some reason is not able to cope with and retreats into this neurotic sort of disability. And then this is aggravated further by the desire of the person's own mind to have something physically wrong with him. To account for his disablement.
"Q. Doctor, do you know what it would take to secure this man or is it considered indefinite condition? A. I would have to consider it indefinite at the time. If there is any particular degree of nerve lesion involved, and if this doesn't clear, then I think that this may make his prognosis better. His outlook better.
"Q. Do you attribute his present condition as he is now, to conversion hysteria? A. Yes, I do.
"Q. Did you have occasion to re-examine Clarence Miller? A. Yes, I re-examined him on September 20th. And my examination at that time showed essentially the same picture, there was some change in the sensory disturbance, whereas before it had been a purely stocking type of anesthesia of the entire leg and it now involved the anterior and lateral and medial surfaces of the leg. Rather than up over the knee.
"Q. Well, does that change your diagnosis in any way? A. No, sir.
"Q. It's still your opinion that Clarence Miller is disabled from returning to any hard work? A. Yes.
"Q. And that the duration of that is indefinite? A. Is indefinite."
The testimony of a number of lay witnesses on behalf of plaintiff establishes that he appeared to be incapable of any long sustained physical effort and his exertion in connection with walking or being on his feet were limited to periods not exceeding one and one-half to two hours. According to these witnesses plaintiff walked with a perceptible limp and was incapable of the nature of physical activity and exertion which he had been able to sustain prior to the injury. It was observed that plaintiff tired somewhat easily and complained of pain. Plaintiff testified that he had attempted to do some plowing on his father's small farm where he lived, but was unable to endure this kind of manual labor.
At the age of seventeen plaintiff quit school while in the sixth grade. It is obvious that plaintiff is below normal in intelligence and is of that type of mentality which, according to the testimony of Dr. Texada, is more susceptible to neurosis and hysteria. At the time of trial plaintiff was employed at the State Colony & Training School in a capacity which required guarding or keeping watch over patients. Plaintiff testified, and the point was not disputed, that he performed the greater part of his duties while seated, and it is not shown that he was required to be on his feet for any extensive period of time. Plaintiff's application for employment at the State Institution was introduced in evidence and particular attention was called to the fact that, in answer *515 to the question as to the condition of health, plaintiff had circled the words "very good". We consider this fact of little significance and, indeed, we cannot conclude that this descriptive phrase was inaccurate, considering the nature of the work for which plaintiff applied, and, further, that there is nothing wrong with plaintiff's general condition of health so long as he is not required to stand or walk or engage in manual labor which places a strain upon the injured leg.
Some six months after trial, on motion of counsel for defendant, the case was ordered reopened for the purpose of admitting in evidence a motion picture film depicting some activities of plaintiff, which film had been taken by agents of the defendant approximately four months after trial. The motion to reopen was opposed by counsel for plaintiff, but, after viewing the film under discovery procedure, counsel chose to offer no objection to its admission in evidence. This film has been viewed by this court, but we do not find the result to be persuasive. The film is very indistinct and, in our opinion, does not furnish any clear and substantial evidence from which any definite conclusions might be drawn.
Upon the basis of the above enumerated facts we proceed to a consideration of the issues. The question first set forth in the beginning of this opinion relates to the establishment of disability attributable to some form of conversion hysteria or traumatic neurosis related to the injury.
It is strenuously urged by counsel for defendant, and reference was made to this point in the opinion of our distinguished brother of the district court, that plaintiff has failed to prove his case by a preponderance of the evidence sufficient to establish disability and a causal connection between the accidental injury and the alleged disability. In support of this conclusion it is urged that much, if not all, of plaintiff's evidence depends upon subjective symptoms and complaints.
It is true that despite their opposed diagnoses and the resulting conclusions on the question of plaintiff's ability to work, neither Dr. Banks nor Dr. Hamilton found objective evidences of disability. However, on this point the jurisprudence is well settled that the existence of disabilitythat is, a present existing conditionmay be established by subjective evidence if it is related to an original objective condition. Brown v. Joseph Rathbone Lumber Co., 11 La.App. 599, 123 So. 383; Frantz v. Schroeder, 184 La. 945, 168 So. 110; Vega v. Higgins Industries, Inc., La.App., 23 So.2d 661.
In the instant case there can be no doubt as to the establishment of the original injury by indisputable objective evidence. The question here tendered involves the sufficiency, vel non, of subjective evidence of disability which is related to the original accidental injury. In the resolution of this point it is necessary to determine the nature and character of the asserted disability which is denominated as "traumatic neurosis" or "conversion hysteria". These medical terms are generally synonymous and fall within that specialty of medical science which deals with mental and nervous, rather than physical, affections and disabilities. For this reason we are not disposed to give any weighty consideration to the testimony of the orthopedic specialists. The chief value of this testimony is found in the fact that it has established beyond question the original physical injury. Our task is to determine whether plaintiff's alleged disability is real or imaginary.
As we have heretofore noted, the only testimony in the neurological field was that of Dr. Texada, a witness for plaintiff, whose observations and conclusions, from a scientific standpoint, must therefore be accepted as uncontroverted.
In his testimony Dr. Texada defined "conversion hysteria" as an emotional disturbance in which a patient's anxiety is unconsciously directed into the muscular *516 or sensory system of the body, resulting in impairment thereto. The witness explained that conversion hysteria, resulting from trauma, constitutes what is sometimes denominated as traumatic neurosis.
We have verified this definition by reference to certain recognized medical texts. Dr. Bernard S. Maloy in his work on "Nervous and Mental Diseases" (1935), page 307, et seq., under the topic of "Traumatic Neurasthenia", discusses post-traumatic neurosis and hysteria. Inter alia, he makes the following observation:
"Posttraumatic hysteria is perhaps the most common of the `functional' nervous diseases met with after injury. These patients present such signs and symptoms as blindness, deafness, paralysis, anesthesias, and disturbances of motion and gait, which are based mainly upon the patient's notions of their anatomic relationships. They are termed pseudo-organic signs and symptoms."
Dr. Gray in his "Attorney's Text Book of Medicine" (Third Edition, 1951), Section 101.01 defines "hysteria" as a disease wherein the loss of emotional control leads to derangement in the nervous system and resultant perversions of motor and sensory functions.
There can be no question in this case as to the correctness of the conclusion that plaintiff is either suffering from a genuine hysteria or is malingering. The principle that courts will stigmatize a claimant as a malingerer only upon positive and convincing evidence justifying such a conclusion is so well imbedded in our jurisprudence as to preclude the necessity for specific citations.
In the instant case there is no such character of evidence. It may be argued that the record contains certain implications of malingering, for example, Dr. Banks' reference to plaintiff's grotesque exaggeration of a limp, and the noting of the same point in the opinion of the district judge. After thorough consideration we are not persuaded to view these findings as constituting any such implications, whether intended or unintended. There is a vast distinction between malingering and a claimant's exaggeration of his condition. On this point, with specific reference to the genuineness, vel non, of plaintiff's condition, we again refer to Gray's Attorney's Text Book of Medicine, Section 101.06, from which we quote the following extracts:
"The many varieties of hysteria are all characterized by their variableness. The changing aspect of the disease is its hall-mark. What is found in the patient one minute may be absent the next. A suggestion from the doctor, friend, relative, or attorney causes the appearance of new signs and symptoms. The application of nerve impulses produces instantaneous change in the picture. Thus the unthinking doctor asserts the patient to be a malingerer. He is not. He is fooling himself, and may honestly simulate anything that is suggested either by conversation or nerve stimulation."
* * * * * *
"Fatigability is a valuable symptom, wherein the patient becomes tired upon either mental or physical exertion, far beyond that normally present."
* * * * * *
"Anesthesias are most perplexing, and frequently lead to a conclusion that the patient is a malingerer. This is due to the fact that they are not limited to particular areas of distribution of a nerve. One finds the so-called stocking anesthesia, wherein the patient cannot feel throughout the lower leg, but the line of demarcation with the normal is clear-cut and frequently encircles the limb. There is no such nerve distribution as this. The conclusion is inevitable that the anesthesia is not related to derangement of any nerve group. This is *517 true in the glove anesthesias of the hand and forearm. They are not evidence of false statements, but are real. The patient actually fools himself, and cannot feel in the areas described. There is nothing wrong with the nervous system from an organic viewpoint, but the brain actually fails to interpret stimuli from the anesthetic area with conscious realization that stimulation has occurred. Instantly the area involved may change, or be present through weeks, months, and years."
The above quotations from the text cited do much to corroborate Dr. Texada's testimony with reference to the symptoms and manifestations of plaintiff's condition. While it is true that fatigue, loss of weight, nervousness, tremulousness, anxiety, fear, sometimes manifest themselves in cases of conversion hysteria, this is not always true, and neither the presence nor the absence of one or all of these evidential manifestations is necessarily significant.
After thorough study and consideration we have reached the conclusion that plaintiff has successfully discharged the burden of proof by establishing the existence of a disabling form of hysteria directly attributable to the original injury. The only direct testimony on this issue was tendered by Dr. Texada, a specialist in neurology, who expressed the very positive opinion that plaintiff was disabled from the performance of hard manual labor, and that the duration of this disability was indefinite. The testimony of this witness stands in the record uncontradicted and uncontroverted.
In the very recent case of Singleton v. W. L. Richardson & Son, Inc., La.App., 95 So.2d 36, our brethren of the Orleans Court affirmed a judgment in favor of plaintiff. It appears from the opinion in the cited case that the testimony of orthopedic specialists convincingly justified the conclusion that the plaintiff had suffered no permanent bone pathology as a consequence of his accidental injury. However, the court analyzed the testimony of an expert in neurology and psychiatry, a witness for plaintiff, and predicated its conclusion upon his diagnosis of traumatic neurosis. It is significant that the court commented on the fact that defendant offered no expert psychiatric testimony in rebuttal to that submitted by plaintiff's expert witness.
Remarkably analogous to the instant case, on the basis of the facts involved, is a comparatively recent case decided by our brethren of the First Circuit, Dupre v. Wyble, 85 So.2d 119, 121 (Writs denied). Plaintiff's claim in the cited case was predicated upon an injury to his left leg, resulting in a neurotic reaction. In the cited case the following facts are identical with those which we have under consideration in the instant case:
Plaintiff was a man of "limited" education and intelligence; only one psychiatristwho was tendered by plaintifftestified in the case, and his diagnosis was that plaintiff's disability resulted from a traumatic psychoneurosis, resulting and residual from plaintiff's leg injury; plaintiff exhibited a limp which was attacked as spurious on the ground that orthopedic experts testified that walking with the foot turned in, as plaintiff affected (which appears to be identical with what has been characterized in the instant case as a "grotesque" limp), would increase rather than diminish pain, and finally it was urged that the absence of atrophy in the injured leg indicated the lack of the normal need to favor one leg over the other.
In his opinion in the Dupre case Judge Tate observed:
"Besides, as to the first-mentioned testimony, medical opinion as applied to what a normal person would or would not do, does not necessarily indicate the absence of a genuine limp in a neurotic person suffering from a genuine hysteria who adjusted his foot and walk in such manner to receive *518 (imaginary) ease from genuinely-felt pain."
We are fully cognizant of and have striven to take into proper consideration the dangers of abuse that are implicit in the acceptance of mental and nervous disorders and affections as constituting disability within the intent and purpose of our compensation statute. This danger has been voiced numerous times by the courts of this state, and it is accepted as an established principle, that the evidence in cases of this nature should be scrutinized with extreme care and that every precaution should be taken to protect employers and insurers against unjustified claims which lie in the somewhat nebulous realm of mental affections. On the other hand, the contrary danger of denying recovery to a deserving claimant is equally apparent.
The principle of allowing recovery for disability upon the basis of a diagnosis of neurosis or hysteria is now firmly established, beginning in 1925 (insofar as our research indicates) with the holding of this court in Wilkinson v. Dubach Mill Co., Inc., 2 La.App. 249, and continuing through a now comprehensive list of cases, including Vaughn v. Solvay Process Co., La.App. First Circuit, 1937, 176 So. 241; Mitchell v. T. L. James & Company, Inc., La.App. First Circuit, 1937, 176 So. 245; Porter v. W. Horace Williams Co., La.App. Second Circuit, 1942, 9 So.2d 60; Buxton v. W. Horace Williams Co. Supreme Court, 1943, 203 La. 261, 13 So.2d 855; Vega v. Higgins Industries, Inc., La.App. Orleans, 1945, 23 So.2d 661; Lala v. American Sugar Refining Co., La.App. Orleans, 1949, writs denied, 38 So.2d 415; Peavy v. Mansfield Hardwood Lumber Co., La.App. Second Circuit, 1949, 40 So.2d 505; Ladner v. Higgins, Inc. La.App. Orleans, 1954, 71 So.2d 242; Dupre v. Wyble, supra; Tate v. Gullett Gin Co., La.App. First Circuit, 1956, 86 So.2d 698; Mamon v. Farnsworth & Chambers Construction Co., Inc., La.App. First Circuit, 1956, 86 So.2d 764; Sharp v. Hardware Dealers Mutual, La.App. First Circuit, 1956, 90 So.2d 889; Malbreaux v. Barber Bros. Co., La.App. First Circuit, 1957, 91 So.2d 62; Singleton v. W. L. Richardson & Son, Inc., La.App. Orleans, 1957, supra.
The principle is recognized and enunciated by the text writers: Schneider's Workmen's Compensation Law, Volume 1, Section 204a declares:
"Even though an accident may not produce an anatomical pathology, nevertheless if the workman does in fact become disabled as a result of that accident, the injury is compensable, although such disability may be the result of hysteriaand may be traceable to a mental condition and not a physical disorder."
Larson's Workmen's Compensation Law, Volume 1, Section 42.22 states:
"* * * When there has been a physical accident or trauma, and claimant's disability is increased or prolonged by traumatic neurosis or hysterical paralysis, it is now uniformly held that the full disability including the effects of the neurosis is compensable. Dozens of cases, involving almost every conceivable kind of neurosis or hysterical symptoms have accepted this rule."
Malone's Louisiana Workmen's Compensation Law and Practice, Section 276, reads:
"Due to the fact that dependable medical diagnosis of neurosis and hysteria is of only recent origin, the courts in some of the earlier cases betrayed an obvious reluctance to regard a purely functional disorder as sufficient to warrant a finding of disability (Turner v. Standard Oil Co. of La., 2d Cir. 1925, 1 La.App. 665. We find, instead a tendency to search for some physiological basis to corroborate the symptoms of disability described by the victim (Wilkinson v. Dubach Mill Co., Inc., supra). If an observable deformity or other physical injury could be found, the courts were often willing to accept *519 the report of the victim and his expert witnesses as to the severity of the consequences due to the worker's ensuing mental condition (Vaughn v. Solvay Process Co., supra; Mitchell v. T. L. James & Co., supra; Wright v. La. Gas & Fuel Co., La.App. 2d Cir. 1932, 140 So. 712).
"Later, the courts came to a recognition that a blow or other accident could produce symptoms of disabling pain or paralysis long after the observable physical signs of hurt had disappeared, and where the medical proof is satisfactory they are now willing to declare the victim of traumatic hysteria to be a disabled person entitled to compensation under the Act. (McCastle v. Architectural Stone Co., La.App. 1st Cir. 1941, 4 So.2d 120; Esthey v. Avondale Marine Ways, Inc., La.App. Orl., 1946, 25 So.2d 631; Peavy v. Mansfield Hardwood Lbr. Co., supra)."
It has been rather plainly intimated in the presentation of argument of the instant case that plaintiff is suffering from "compensationitis" and is subject to an efficient cure by application of a "greenback poultice." We are quite appreciative of the validity of this argument for, strangely enough, it cannot be dismissed as a mere cynical observation argumentatively advanced by an insurer's counsel. The affliction is recognized as constituting, in some cases, a real disability. Larson's work on compensation law, cited supra, comments in Section 42.24 as follows:
"The most controversial mental-injury question is that of the compensability of `compensation neurosis.' `Compensation neurosis', which must be distinguished from conscious malingering, may take the form of an unconscious desire to obtain or prolong compensation, or perhaps of sheer anxiety over the outcome of compensation litigationin either case producing a genuine neurosis disabling the claimant. In the Hood case, for example, (Hood v. Texas Indemnity Ins. Co., 1948, 146 Tex. 522, 209 S.W.2d 345) where both sides of the case were well presented in the majority opinion and in the three-judge dissent, the controlling medical testimony was to the effect that claimant's disability would probably clear up as soon as the litigation was over, but that he was for the time being genuinely disabled by a neurosis caused in part by an `unconscious desire for compensation.' The majority awarded compensation on the theory that this was only one contributing cause of the neurosis, which was not fatal to the award since the injury need not be the sole cause of the disability. The dissent viewed the neurosis as an independent intervening cause. Awards have been made on somewhat similar testimony in Washington (Peterson v. Department of Labor & Industries, 1934, 178 Wash. 15, 33 P.2d 650), where the court said, `Classifying his case as a "desire neurosis" it is still traumatic in origin.', and Minnesota (Welchlin v. Fairmont Railway Motors, 1930, 180 Minn. 411, 230 N.W. 897), where the medical testimony was that if the case could be settled up and the claimant got back to work, his limp would disappear. Some support in principle for this view may be found in a New York case (Rodriguez v. New York Dock Co., 1939, 256 App.Div. 875, 9 N.Y.S.2d 264, leave to appeal denied, 280 N.Y. 852, 20 N.E.2d 398) which held compensable a case of dementia praecox caused in part by the workman's brooding over delay in receiving compensation payments.
"On the other hand, two cases have denied compensation for neurosis attributable to an unconscious desire for compensation. In one (Swift & Co. v. Ware, 1936, [53] Ga.App. [500], 186 S.E. 452), the claimant, who had already received one compensation *520 award and recovered, relapsed into paralysis because of the `defense reaction' of producing the symptoms which previously had brought compensation. In the other (Kowalski v. New York, N. H. & H. R. Co., 1933, 116 Conn. 229, 164 A. 653 [86 A.L.R. 957]), nervous symptoms caused by anxiety over pending compensation litigation and uncertainty of continuance of payments were held to be an independent cause and not compensable.
"As a matter of pure theory, the cases awarding compensation have the better of it, since, assuming that the anxiety over compensation and the accompanying neurosis is genuine, the line of causation from the original injury to the present disability is unbroken. The denial of compensation is probably dictated less by causation theory than by a fear that the extremely fine line between malingering and `compensation neurosis' cannot as a practical matter be successfully drawn. It will not do to brush aside such claims, however, as the dissent in the Hood case did, by asking, `How could it be real when, as shown by Dr. Cline's testimony, it was purely mental * * *?' While it lasts, the neurotic mental disability is as real as any other disability, and, in the absence of evidence of malingering, is as much a personal injury (To nullify the commission's right to take into consideration claimant's fear and anxiety as a proper basis of award of compensation is to deny claimant's right to establish the existence of a very real injury. Fear and anxiety constitute as great an influence on human behavior and health as is known to either psychology or medicine, and in this case was not merely a subjective mental symptom. National Lumber & Creosoting Co. v. Kelly, 1937, 101 Colo. 535, 75 P.2d 144). As for malingering, it is better to leave that problem to the skill and experience of compensation administrators, who usually manage in time to develop uncanny skill in detecting malingerers at the fact-finding level." (Citations and emphasis supplied.)
Upon the basis of the uncontradicted testimony of Dr. Texada, which supports his positive conclusion of disability, and the corroboration of plaintiff's claims by a number of lay witnesses, we are convinced that plaintiff has adequately discharged the burden of establishing his claim by a preponderance of the evidence.
We think the conclusion which we have reached, supported by the overwhelming weight of authority as above cited, can best be summarized by the paradox that a disability is nonetheless real because its causation is imaginary. The test is whether the employee is sincere in his belief that he suffers a disabling resultant of a real injury. Qualified experts in fields of neurology and psychiatry, whose scientific research, study and practice is concerned, in part, with the relationship between mental processes and physical functions, appear to have subscribed to and accepted the verity of the scriptural proverb anent the nature of man:
"For as he thinketh in his heart so is he." (Proverbs 23:7)
Having reached the conclusion that plaintiff has established a compensable disability, we proceed to a consideration of the basis of computation of the award to which plaintiff is entitled. Counsel strongly urge that plaintiff's work record, which was introduced in evidence by agreement of counsel in the instant case, discloses that, though a regular employee over a period of twenty-six weeks, his working hours were most irregular. The record indicates hours worked per week varying from a minimum of five hours to a maximum of forty-five hours. The maximum of forty-five hours per week, for which plaintiff received pay in the total sum of $33.75, is reflected as having occurred only upon two weekly periods. In other words, counsel *521 contends that plaintiff never worked on the basis of a six-day week and, indeed, on only a few occasions did he work as much as five days per week. It is urged, in view of these facts, that plaintiff's rate of compensation should be based on his average earnings. We are deeply sympathetic with counsel's contention on this point, in view of our conclusions as expressed in Troquille v. Lacaze's Estate, La.App., 59 So.2d 505, in which we based the weekly wage upon an average over a period of one year preceding the date of accident, and in Carrington v. Consolidated Underwriters, La.App., 80 So.2d 427, in which we fixed the amount of recovory upon the basis of the rate of pay computed on an eight-hour day of five days per week. In each of these cases the Supreme Court granted writs and, apparently totally unimpressed by our ratio decidendi, reversed our judgments on this point. In the Troquille case, 222 La. 611, 63 So.2d 139, the Supreme Court held that plaintiff was entitled to compensation based on a six-day week at a daily rate of pay of $6.75. In the Carrington case, 230 La. 939, 89 So.2d 399, 404, the per curiam opinion of the Supreme Court on rehearing spelled out the approved formula in words of such clarity and certainty as to prevent any possible future misinterpretation:
"After determining an employee's daily wage, the six day week is to be employed in calculating his weekly wage. If he is injured, he is deprived of this ability to work six days per week, and remuneration is rewarded him for this deprivation. This test must be applied regardless of the number of days he works for the particular employer, by whom he is employed at the time of his injury." (Emphasis supplied.)
In the face of this inescapable directive, we are compelled to reject counsel's contention, and accordingly we adopt the weekly award of $26.32 which was the basis of payments made during the forty-three week period in which defendant recognized plaintiff's disability.
Finally, as to plaintiff's claim to statutory penalties and attorney's fees, it suffices to say that such a recovery could not be justified in the instant case by any stretch of the imagination. The foregoing involved and lengthy opinion attests the seriousness of the issues tendered.
For the reasons assigned the judgment appealed from is set aside and reversed and
It Is Now Ordered, Adjudged and Decreed that there be judgment in favor of plaintiff, Clarence W. Miller, and against the defendant, United States Fidelity & Guaranty Company, in the full sum of $26.32 per week, beginning June 7, 1955, and continuing for the duration of plaintiff's disability, not, however, to exceed 400 weeks from said date, together with interest at the rate of 5% per annum from maturity on each such weekly payment from the date due until paid, less a credit for payments made for a period of 43 weeks at the rate of $26.32 per week.
It Is Further Ordered, Adjudged and Decreed that the fee of plaintiff's attorneys be and it is hereby fixed at 20% of the amounts hereinabove awarded, to be paid as and when made by defendant, not exceeding, however, the maximum of $1,000 as fixed by statute.
It Is Further Ordered, Adjudged and Decreed that the fees of the expert witnesses who testified in person or by deposition are hereby fixed at $50 each and taxed as costs in these proceedings.
Defendant-appellee is assessed with all costs.